[No. D062429. Fourth Dist., Div. One. Mar. 14, 2013.]

In re A.J., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
JAMIE P., Defendant and Appellant.

## COUNSEL

Rosemary Bishop, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Beth Ploesch, under appointment by the Court of Appeal, for Minor.

## OPINION

**McCONNELL, P. J.**—Jamie P. appeals the juvenile court's order terminating jurisdiction after it placed her daughter, A.J., with A.J.'s biological and presumed father, Joshua S., in Hawaii. Jamie does not contest A.J.'s out-of-state placement with her father. She challenges only the trial court's denial of her request to retain dependency jurisdiction. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

#### *Initial Dependency Proceedings and Attempts to Locate A.J.'s Natural Father*

On October 26, 2011, the San Diego County Health and Human Services Agency (Agency) filed a petition under Welfare and Institutions Code section 300, subdivision (b)[2] on behalf of then seven-year-old A.J. and her two half siblings, ages five and nine months, alleging that A.J.'s stepfather had applied excessive discipline by beating A.J. with a belt, including over scars from a recent surgery, and that her mother, Jamie, had been aware of this abuse but failed to protect her.[3] The family had several prior referrals to the Agency for

---

[1] Jamie originally appealed the juvenile court's custody orders and its order placing A.J. with her father as well as its order terminating jurisdiction. However in her opening brief, she states she is appealing only the order terminating jurisdiction. We therefore deem abandoned her appeal of the juvenile court's other orders. Because Jamie does not appeal A.J.'s placement with Joshua or the court's denial of her request to return A.J. to her care, our summary of the complex factual and procedural history of this case is focused on matters relevant to the trial court's termination of jurisdiction.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[3] A.J.'s half siblings are not part of this appeal.

abuse of A.J. by her stepfather, one of which resulted in voluntary provision of services to Jamie and the stepfather in 2009. At the initial detention hearing, the juvenile court ordered A.J. detained at Polinsky Children's Center (Polinsky) or in a licensed foster home.

A.J. was the result of a brief encounter between Jamie and the natural father, and he was not named on her birth certificate. At the time of the detention hearing, the whereabouts of A.J.'s natural father were unknown, although Jamie informed the Agency that she last knew him to be living in Hawaii, and she had provided the Agency with a name. The court ordered the Agency to conduct a reasonable search for the father to inform him of the dependency proceedings. .

In connection with the initial jurisdiction and disposition hearing, the Agency reported that attempts to locate A.J.'s natural father had thus far not been successful, even though the Agency was aware the father had been paying A.J.'s child support. At the January 5, 2012, settlement conference, the juvenile court sustained the allegations of the Agency's petition and ordered A.J.'s continued detention. The court also found that "reasonable search efforts have been made to locate and notify" A.J.'s natural father, but ordered the Agency to continue its efforts to locate him. A special hearing was set to address paternity and search efforts, but at that subsequent hearing the Agency reported that its further attempts to locate A.J.'s natural father had produced no new information.

A.J. was reported to be a bright, spirited little girl with some behavioral issues. She displayed a temper, was disobedient and had trouble following the rules. A.J. had been placed with a nonrelated extended family member, but in April 2012, the caregiver requested that A.J. be removed from her care because of A.J.'s unsafe behaviors, including leaving the home and attempting to injure herself. A.J. was removed to Polinsky on April 6, 2012, with the intention that she be placed in an intensive treatment foster care home. On April 30, 2012, the Agency filed a section 387 petition requesting the court order a higher level of care for A.J. The court ordered A.J.'s continued detention at Polinsky, set a jurisdiction and disposition hearing for May 2012 and scheduled the six- and 12-month review hearings.

*Joshua's Appearance and Efforts to Obtain Custody of A.J.*

In May 2012, the Agency reported that it was finally able to track down A.J.'s natural father through child support records, explaining that the name Jamie had given for the father was inaccurate. A.J.'s natural father, Joshua, contacted the Agency promptly after receiving the social worker's letter about A.J.'s situation. He explained that after his encounter with Jamie,

he had moved to Hawaii to help with his aunt's farming business. He had not been informed of A.J.'s birth until a year later. He had undergone a paternity test and had regularly been making child support payments since 2004. Because he was living in Hawaii and had no relationship with Jamie or A.J., he did not know how he could have been an active father, and he had decided to "just let the mother care for" A.J. However, he stated that he was upset the Agency had not attempted to contact him during the 2009 voluntary case.

Joshua "expressed that he had made a grave mistake by not taking an active part [in A.J.'s] life and he [felt] awful that he allowed her to be raised in an abusive household." He had thought of A.J. often, particularly around the time of her birthday, and was very concerned she would be abused again in the future. Joshua married in 2007, and he and his wife have two daughters born in 2010 and 2011. Joshua is a high school graduate, attended community college and is employed as a maintenance supervisor. He and his wife have extensive family support in Hawaii.

Joshua made his first appearance telephonically before the juvenile court on May 21, 2012, and requested that A.J. be placed with him. The court appointed counsel for him and found him to be the biological father of A.J. His counsel informed the court that Joshua already had made contact with A.J. by telephone, letters and photographs and had scheduled an in-person visit. The Agency indicated it needed additional time to evaluate Joshua before making a recommendation as to placement. Jamie urged the court to "move rather slowly" with respect to a placement decision inasmuch as Joshua had not been present in A.J.'s life until that time and was a "mere biological father, not entitled to custody." The court ordered supervised visits between Joshua and A.J., with Agency discretion to lift the supervision, confirmed the six- and 12-month review dates and set a contested disposition hearing for June 29, 2012. Later, the court vacated the June 29, 2012, hearing date and ordered a new hearing date of July 27, 2012.

A.J. first learned about her biological father about five years previously, when she found a picture of him, but her mother had encouraged her to forget about him. A.J. was very excited to see the pictures and hear the letters from her father and his family members, and she was eager to visit with them. Joshua first visited San Diego in late May 2012 to meet and begin to establish a relationship with A.J. By all accounts, this visit was a success. Joshua and A.J. visited daily both at Polinsky and at a nearby park. A.J. was very comfortable with her father and enjoyed his visits immensely. Joshua acted appropriately with his daughter and was fully engaged when playing with her. After the initial visitations, A.J. was comfortable with short, unsupervised visits, and she and Joshua went to SeaWorld together. During his visit, Joshua was brought up to date on A.J.'s medical needs (particularly those resulting

from kidney surgery she underwent in Sept. 2011), and was made aware that she would need ongoing therapy to deal with the physical abuse in her past. He was also able to meet with A.J.'s teacher to learn about her academic and behavioral performance in school. Joshua and the Agency began to plan an extended visit for A.J. in Hawaii.

The Agency proposed that A.J. spend a week to 12 days with Joshua in Hawaii before the scheduled July hearing date, in order to more fully assess the suitability of A.J.'s placement with her father. Jamie objected to the visit, arguing that it would impede her reunification with A.J., and that the proposed length of the visit was too great given A.J.'s limited exposure to Joshua. On June 20, 2012, the juvenile court found the visit to be appropriate, and that a longer visit was warranted to give A.J. "a sense as to the family and what life is like" in Hawaii. The court confirmed its finding that Joshua is the biological father, and entered a judgment of parentage.[4] The court also continued the six-month review hearing from June 26 to July 16, 2012, to allow time for A.J.'s visit to Hawaii to be completed.

A.J. visited her father from June 24 to July 15, 2012, accompanied by the Agency's social worker. Again, the visit was successful. A.J. was very comfortable with her father and his family there. When asked by her social worker, A.J. was "adamant" that she wanted to live in Hawaii with her father and have frequent contact with her mother and family in California. The State of Hawaii Department of Human Services, Child Welfare Services (CWS), approved Joshua's home as a residence for A.J. The Agency recommended that the court place A.J. with Joshua and terminate jurisdiction. A.J.'s court-appointed special advocate also recommended placement with Joshua, but did not recommend termination of jurisdiction at that time.

At the initial six-month review hearing held on July 16, 2012, Joshua indicated he was seeking status as the presumed father under Family Code section 7611, subdivision (d). Jamie stated her opposition to A.J.'s placement with Joshua as he was a mere biological father, and indicated she would be requesting that A.J. be returned to her care. The Agency took the position at that time that Joshua did not yet meet the criteria for presumed father status, but argued that A.J. nevertheless should be placed with him. The court set the matter for July 27, 2012, combining it with the contested six-month review and section 387 jurisdiction and disposition hearing. The court also set a special hearing for July 18, 2012, to further address Joshua's parentage status and review the procedural posture of the case.

---

[4] Judicial Council form JV-501 (Parentage—Findings and Judgment) filed on June 20, 2012, declared Joshua to be the "presumed parent" of A.J. The parties agree this was a clerical error, as the juvenile court made clear during the hearing that it was finding Joshua to be only the biological father of A.J. at that time.

At the July 18 hearing, the trial court found "at this time that [Joshua] does not yet meet the burden to qualify for [Family Code section] 7611[, subdivision] (d)" status, but added "if he continues to . . . care for the child and to devote himself to . . . a relationship with the child," he "will in the future be able to elevate his status." Additionally, Joshua filed a section 388 petition, alleging that because the Agency failed to make reasonable efforts to search for him, he did not receive proper notice of the dependency proceedings, and the court therefore should make a new disposition order as to him. He requested that the court find him to be a noncustodial, nonoffending parent and that custody of A.J. be placed with him pursuant to section 361.2. Alternatively, he requested reunification services.

The filing of Joshua's section 388 petition complicated the procedural posture of the case further, in that Jamie argued that returning to the disposition phase required the court to review all dispositional issues, including the court's initial removal of A.J. from Jamie's care. The court set an additional hearing for July 20, 2012, to further address these issues and rule on the section 388 petition. The court requested the parties to address at that time whether section 361.2 authorizes granting custody to a nonoffending, noncustodial biological father, as opposed to a presumed father.

At the July 20 hearing, the juvenile court first granted Joshua's section 388 petition, finding that although Jamie initially may have misstated Joshua's name, the Agency had accurate information about his name earlier than May 2012 but failed to follow up appropriately and make a reasonable search, as a result of which Joshua failed to receive proper notice. The court vacated its January 2012 disposition and indicated that procedurally, the parties would "go back to disposition" with respect to Joshua's request for custody, but it rejected Jamie's argument that she also was entitled to a new disposition hearing. Additionally, the court held that section 361.2 did not apply because Joshua was not yet a presumed father and, accordingly, the court determined it would evaluate Joshua's request for custody of A.J. under the standard of whether such placement would be in her best interests. Finally, the court observed that there was a "paucity of information" regarding the ability of Joshua's family to "absorb another child" and whether A.J. would receive the services she needs in Hawaii, and urged the parties to develop that record to assist the court with its best interests analysis. The court continued the six-month review hearing to allow the Agency to submit a modified six-month review report providing additional information pertinent to A.J.'s potential placement in Hawaii.

### The Disposition Hearing

In connection with the July 27, 2012, hearing of the contested disposition, the Agency filed an addendum report recommending that A.J. be placed with

her father and that jurisdiction of the juvenile court be terminated. The report provided additional detail on A.J.'s visit to Hawaii, indicating that it was very positive, that A.J. felt accepted there and she got along well with her half sisters, stepmother and her father's parents. A.J. reported one incident where her stepmother spanked her once on the bottom after she intentionally performed a rude act in her stepmother's face. A.J. was not injured as a result, and commented that "[i]t was nothing" and she was not scared by the act. She stated that other forms of discipline were used, including talking to her and placing her in timeouts. A.J. told the social worker that although she would miss her mother, she wanted to live with her father in Hawaii.

In the report, the Agency explained that the stepmother was "so ready" to be there for A.J. and would see that "she is very loved here." With respect to the spanking incident, the stepmother stated that it occurred only after A.J. ignored earlier warnings about the inappropriateness of the behavior at issue, but indicated she understood that given A.J.'s history, physical discipline should be avoided in the future. As to the services A.J. would need, Joshua reported that he had put A.J. on his medical insurance and obtained a pediatrician and dentist for her, had begun therapy to assist him in parenting A.J., had obtained referrals for therapists for A.J. and had enrolled A.J. in a private school to begin in the fall of 2012.

The contested disposition hearing was held on July 27 and 31, 2012.[5] The court first heard testimony from A.J.'s therapist, Timothy Gillick, who testified that although A.J. first displayed anxiety and aggressive behaviors while at Polinsky, her behavior improved a great deal with therapy, and she became more social, more careful about her grooming, more able to discuss her feelings and participated in more activities. He testified that A.J. was excited and happy about visiting her father, and he received no negative statements from her after the Hawaii visit. He had not witnessed physical interactions between Joshua and A.J., but Joshua was appropriate in his phone calls with A.J., which were animated and engaging. Joshua had told Gillick that when A.J. visited Hawaii, he initially had some limit-setting problems with her, but once he set expectations with A.J., the visit went well. Gillick

[5] In advance of the hearing, Jamie had filed a section 388 petition asking the court to return A.J. to her care. To address the procedural conundrum posed by having both a contested disposition regarding Joshua and a combined six-month review/section 388 petition regarding Jamie pending at the same time, the juvenile court ruled that it would first proceed with the contested disposition and the issue of whether placement with Joshua was in A.J.'s best interests. The court indicated it would not rule immediately on that issue, in order to preserve Jamie's right to seek custody, and instead would then allow Jamie to proceed with the six-month review/section 388 petition insofar as any additional evidence was required to determine the issues raised in that petition. The practical effect of this ruling was that the court heard during the same proceeding all the evidence supporting both parents' requests for custody of A.J. Inasmuch as Jamie is not contesting placement with Joshua, we will not review here the evidence relevant principally to Jamie's request for custody of A.J.

testified he had no concerns about A.J. joining a blended family. He testified that he believed A.J. loved her mother and had some conflict about leaving her. He recommended that A.J. be placed with her father. When asked if A.J.'s perception of Joshua was still in the "idyllic" stage, Gillick responded it was past that point, and that Joshua had spent enough time with A.J. "to actually be a father, to be a disciplinarian, to set limits, and the ideal became reality as to how a father interacts with a child and treats a child." He acknowledged, however, that A.J.'s relationship with Joshua was likely still in the "honeymoon" phase. So long as A.J. continued receiving therapy and other services, he was hopeful her negative behaviors would not flare up again, and they could, in fact, "diminish to zero."

A.J.'s social worker, Heather Flanagan, also testified that A.J.'s interactions with Joshua were positive. Joshua was attentive and engaging with A.J. and gave her the freedom to be herself. A.J. told her she wished to move to Hawaii. Flanagan observed A.J. in Hawaii and met Joshua's family there, and had no concerns about their ability to provide support to A.J. She discussed the one spanking incident with the stepmother and did not believe this posed any safety risk to A.J. Flanagan had no concerns that Joshua would "give up" on A.J. because her conversations with him and his family led her to believe they already considered A.J. a part of their family. Flanagan testified that she believed Joshua would follow through with all aspects of A.J.'s care because he took a proactive role immediately upon being notified of A.J.'s dependency. She recommended termination of jurisdiction because there was no safety risk to A.J. in moving to Hawaii.

During his testimony, Joshua explained that he did not want to "mak[e] excuses" for not being part of A.J.'s life to that point, because he had struggled with that issue and believed he was wrong in not trying to contact Jamie or A.J. earlier. He assumed, however, that A.J. was "having a good life, and that maybe disturbing that would not be helpful for her." He had already taken a number of steps to take on a parenting role for A.J., including getting therapy, becoming acquainted with A.J.'s medical and emotional needs, locating a doctor and possible therapists for A.J., getting involved in her education and enrolling her in a school in Hawaii. Joshua testified he learned to set boundaries for A.J. and she was responsive to that. He permitted frequent contact between A.J. and Jamie while A.J. was in Hawaii, and would continue to do so in the future. He believed A.J. should be placed with him because she needs "a safe, consistent environment, a loving home, and one . . . where she can be a kid and not have to worry about some of the things that she's had to worry about. We can provide that for her."

Finally, the parties stipulated that if A.J. had been called to testify, she would have stated that she felt taken care of in Hawaii. She had met many

people and liked her half sisters. A.J. believed that her stepmother had done the right thing in disciplining her with the spanking. She understood that her mother did not want her to move to Hawaii, and she missed her mother while she was in Hawaii, but got used to not seeing her.

## The Order Terminating Jurisdiction

After conclusion of the testimony, the juvenile court issued its findings. The court first concluded that the Agency established by a preponderance of the evidence that return of A.J. to Jamie at that time would create a substantial risk of detriment to A.J.'s safety, protection and emotional well-being. As to the disposition, the court ordered A.J. to be placed with Joshua in Hawaii, and that it was in her best interests to do so. The court found termination of jurisdiction appropriate because there was "not a protective issue." The court explained: "I can't find by clear and convincing evidence that closing the case today would be likely to recreate the conditions that led to the Court assuming jurisdiction in the first place, and that there is a need for family maintenance services."

More specifically, the court remarked that Joshua "came across as solid and credible, as conscientious, earnest, and as remorseful" for not being involved with A.J. earlier. The court found that he had already been very proactive with A.J. since he learned of the dependency, and is committed to fulfilling her needs. The court observed that A.J. has shown greatly improved behavior since Joshua came into her life. That said, the court acknowledged that A.J. needed structure and continuing services, and that the transition period was critical. Accordingly, instead of terminating jurisdiction immediately, the juvenile court set an additional hearing several weeks into the future to ensure that everything was in place for A.J.'s move to Hawaii, and to allow the parties to work out custody orders.[6]

In connection with the planned hearing, the Agency filed two addendum reports. The first stated that after visiting with her San Diego family members, A.J. moved to Hawaii on August 12, 2012, was enrolled in therapy and had already begun school. A.J.'s therapist had spoken with Joshua and his wife to explain in more detail her therapeutic needs. In the second report, the Agency stated it had contacted A.J.'s teacher in Hawaii, and that A.J.'s new therapist had spoken with her San Diego therapist about A.J.'s needs. The Agency also reported that A.J. had been adjusting well since moving to Hawaii. A.J. stated that she was "very happy" and feels "safe" and "loved" there, and was able to speak with Jamie whenever she wanted.

---

[6] The court also dismissed the Agency's section 387 petition and vacated the scheduled 12-month review hearing.

At the continued hearing held on September 20, 2012, the juvenile court first found that Joshua is A.J.'s presumed father pursuant to Family Code section 7611, subdivision (d). The court then adopted the proposed custody orders with some small modifications. Those orders provided that the parents would share joint legal custody of A.J., and that physical custody would be divided 90 percent/10 percent between Joshua and Jamie respectively. Finally, the court confirmed its decision to terminate jurisdiction, again stating, "I don't think there's a protective issue at this point."

## DISCUSSION

### The Juvenile Court Properly Exercised Its Discretion in Terminating Jurisdiction

A. *The Juvenile Court's Analysis Followed Proper Legal Standards and Its Findings Are Supported by Substantial Evidence*

■ Jamie's principal contention on appeal is that the juvenile court erred in terminating jurisdiction without making a specific determination, under section 361.2, that continued supervision was unnecessary in this case—a determination Jamie insists the trial court could not have made under the facts of this case. We disagree. We conclude the juvenile court evaluated the Agency's recommendation to terminate jurisdiction under the legal standard applicable at the time, and its finding that no protective issue exists that would warrant retaining jurisdiction is supported by substantial evidence.[7]

Section 361.2, the statute Jamie argues controls here, provides as follows: "(a) When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child. [¶] (b) If the court places the child with that parent it may do any of the following: [¶] (1) Order that the parent become legal and physical custodian

---

[7] Generally, we review orders terminating the juvenile court's jurisdiction under an abuse of discretion standard. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300 [55 Cal.Rptr.3d 647].) The court's factual findings are reviewed for substantial evidence. (See, e.g., *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1134 [13 Cal.Rptr.3d 616] (*Austin P.*) [appellate court reviewed record for substantial evidence indicating whether there was a need for continuing supervision].) To the extent an appeal challenges whether the juvenile court based its order terminating jurisdiction on the correct legal authority, we review that issue de novo. (*Bridget A.*, at p. 301.)

of the child. The court may also provide reasonable visitation by the non-custodial parent. The court shall then terminate its jurisdiction over the child . . . . [¶] (2) Order that the parent assume custody subject to the jurisdiction of the juvenile court . . . . [¶] (3) Order that the parent assume custody subject to the supervision of the juvenile court." (§ 361.2, subds. (a) & (b)(1)–(3).)

Joshua certainly qualified as a noncustodial, nonoffending parent, and the court found that placement with him would be in A.J.'s best interests. Despite these factual similarities with the circumstances described in section 361.2, however, that provision did not apply at the time the juvenile court announced its ruling. "[O]nly a presumed father is entitled to assume immediate custody" under section 361.2. (*In re Zacharia D.* (1993) 6 Cal.4th 435, 454 [24 Cal.Rptr.2d 751, 862 P.2d 751].) At the time the court ordered that A.J. be placed with her father in Hawaii, and indicated its intention to terminate jurisdiction, it had found that Joshua was a mere biological father, not the presumed father. For this reason, as Jamie contends, section 361.2 did not govern the juvenile court's analysis.

Another basis for terminating jurisdiction is found in section 364, which applies when a child is *not* removed from the physical custody of his or her parent under section 300, and requires the court to terminate jurisdiction at the six-month review hearing unless it determines that "continued supervision is necessary." (§ 364, subds. (c) & (a).) Although A.J.'s case had proceeded to the six-month review stage at the time the juvenile court terminated jurisdiction, section 364 did not apply because A.J. had been removed from the custody of her mother under section 300.

Plainly, Joshua's request for custody and termination of jurisdiction did not fit neatly within the parameters of either section 361.2 or section 364. However, "[t]he fundamental premise of dependency law is to serve the best interests of the dependent child." (See, e.g., *In re Samuel G.* (2009) 174 Cal.App.4th 502, 510 [94 Cal.Rptr.3d 237].) The law provides the juvenile courts with the necessary tools and guidelines, as well as broad discretion, to make appropriate orders regarding dependent children consistent with this foundational principle. " 'The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion.' [Citation.]" (*In re Gabriel L.* (2009) 172 Cal.App.4th 644, 652 [91 Cal.Rptr.3d 193]; accord, *In re Corey A.* (1991) 227 Cal.App.3d 339, 346 [277 Cal.Rptr. 782] [at § 300 dispositional hearing, the "paramount concern" in deciding where child will live is the child's best interest]; see § 362.4 [providing that when juvenile court terminates its jurisdiction and a custody order has been entered, it may make additional protective or other orders]; § 245.5 [Juvenile court "may

direct all such orders to the parent, parents, or guardian of a minor . . . as the court deems necessary and proper for the best interests of or for the rehabilitation of the minor."].)

Pursuant to this inherent authority, the juvenile court found by "clear and convincing evidence . . . that it is in [A.J.'s] best interest to be placed [with Joshua]. I am satisfied by the case law, Rules of Court, and statute as well as the legislative scheme and the policy underlying it that the Court does have the authority to terminate jurisdiction at this time and to terminate mother's services because of the placement with a parent." The court also found "that there is not a protective issue." The court went on to explain the evidence supporting these findings, including the following: (1) that although Joshua made "a huge error" in not contacting Jamie and A.J. earlier, he has since "grown up, changed, gotten himself into therapy, which is impressive, to deal with all of this"; (2) Joshua came across as "solid and credible, as conscientious, earnest, and as remorseful"; (3) he demonstrated commitment to A.J., "respect[s] her as a child with needs. He's taken on the role of parent. . . . He's jumped into action," talking to service providers and getting his family involved; and (4) A.J.'s behavioral issues had improved significantly and she wants to be with him.

The Agency's assessments and the testimony at the disposition hearing, summarized previously, amply support the court's findings. Significantly, Jamie does not argue otherwise. Instead, she argues that, rather than properly evaluating under section 361.2 whether continuing supervision was necessary, the court used the wrong legal standard in concluding as follows: "I can't find by clear or convincing evidence that closing the case today would be likely to recreate the conditions that led to the Court assuming jurisdiction in the first place, and that there is a need for family maintenance services. I cannot make that finding. So for that reason and other reasons, the Court finds it is appropriate to terminate jurisdiction." This language appears to track that of section 364, which provides that the trial court shall terminate its jurisdiction unless it determines that "conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." (§ 364, subd. (c).)

As explained previously, section 364 did not apply here. Nevertheless, in our view, Jamie's argument exalts form over substance. In the absence of a directly applicable statute, the court explained at length why the record presented no protective issue, which, after all, is the fundamental basis for exercising dependency jurisdiction in the first place. (See *In re Janet T.* (2001) 93 Cal.App.4th 377, 391 [113 Cal.Rptr.2d 163] [before the court may exercise dependency jurisdiction under § 300, there must be evidence that child is exposed to substantial risk of harm]; see also § 300 generally

[exercising dependency jurisdiction requires showing that there is a substantial risk of harm to child].) Logically, the court's analysis and conclusions imply a finding that there was no need for the court's continuing supervision to ensure A.J.'s safety and well-being. The trial court found Joshua to be a committed, responsible parent who could provide a stable, loving and safe home for A.J. and who had taken the necessary steps to see that A.J. would receive all the services, education and health care that she needed. As explained, substantial evidence supports these findings.

In these circumstances, the fact that the juvenile court did not expressly state "there is no need for continuing supervision" is no grounds for reversing its otherwise proper ruling.[8] (See *In re Janee W.* (2006) 140 Cal.App.4th 1444, 1452, 1453 [45 Cal.Rptr.3d 445] [court's use of the language of § 364 instead of § 361.2 to terminate jurisdiction was harmless, where "all the evidence before the court showed that continuing supervision of the minors was no longer required"]; see *People v. Geier* (2007) 41 Cal.4th 555, 582 [61 Cal.Rptr.3d 580, 161 P.3d 104] [appellate court reviews the correctness of the court's ruling, not its reasoning, "and, if the ruling was correct on any ground, we affirm"].) The fact that the court did not use those precise words does not mean, as Jamie contends, that it employed a less rigorous standard in placing A.J. with a mere biological father than would be required for placement with a presumed father. The court found, based on substantial evidence, that there was no protective issue presented by A.J.'s placement with Joshua. Jamie fails to explain how this is any less demanding a standard than one requiring a finding that continued supervision is unnecessary, or what additional evidence would be required to meet this latter standard than had already been presented to the juvenile court.

Jamie responds, however, that the court did not give due consideration to a number of factors that, in her view, mandated retention of dependency jurisdiction and ongoing supervision. These include the fact that A.J. had only recently met her father, that father had prior brushes with the law, that Joshua's wife spanked A.J. once and that A.J. had a history of behavioral issues. The evidence does not bear out Jamie's contention. On the contrary, viewed in its entirety, the record shows the court was aware of and considered these issues, and determined they were insufficient to warrant continuing jurisdiction.

---

[8] For the same reason, we reject Jamie's suggestion that once Joshua was found to be the presumed father, the court should have reevaluated its plan to terminate jurisdiction under the applicable standards of section 361.2. Effectively, the court made all necessary findings during its initial ruling, and no purpose would have been served by the court revisiting its earlier findings.

Joshua demonstrated, to the satisfaction of the court, that he was very remorseful for not entering A.J.'s life sooner, and the court found his efforts to assume the parental role were swift and impressive. Joshua's visits with A.J. had been very successful. Joshua had learned important lessons about setting limits with A.J. The court found he had not only "respected [A.J.] as a child with needs," but had taken the necessary steps to ensure those needs would be met in Hawaii. Importantly, the trial court observed that, despite their relatively short period together, A.J. had thrived with her father in her life. "She has improved in all spheres." Although she was once a girl "who was running helter-skelter out of the cabins and couldn't be controlled," since her father came on the scene, the negative manifestations of A.J.'s behavior issues have "dramatically diminished." Significantly, A.J. was "adamant" about wanting to go live with him in Hawaii, telling the social worker she felt "safe" and "loved" there.

Joshua voluntarily reported to the Agency that he had been a heavy drinker in his 20's and as a result, had been charged twice with driving under the influence, in 2004 and in 2007. However, he completed a drug treatment program and there is no dispute he has remained sober ever since. Joshua also self-reported that he had been charged with "making terrorist threats" to a security guard while on a construction job in 2008. Notwithstanding this rather ominous-sounding charge, the incident involved a single argument between Joshua and a coworker, during which Joshua held in his hand a hammer that he never actually used against the coworker. Joshua was given a deferred sentence, completed anger management classes and community service requirements and paid the required restitution/fines. The Agency confirmed that he had completed the terms of his probation, and that this incident would be expunged from his record as of May 2013. There is no evidence of any other criminal history, and no evidence indicating that such conduct would likely be repeated.

As for the spanking incident, this was a one-time punishment that amounted to one slap on the bottom. The evidence showed the use of this discipline followed earlier, unsuccessful attempts to convince A.J. to stop the offending behavior. Other appropriate forms of discipline (timeouts, for example) had been used in Joshua's home. The Agency was satisfied the stepmother understood the importance of avoiding this form of discipline in the future. Even A.J. agreed the discipline was appropriate under the circumstances, and it appeared to have no lasting adverse impact on her.

This evidence belies Jamie's contention that the juvenile court necessarily would have retained jurisdiction had it applied what Jamie contends was the proper legal standard.[9] The court expressly recognized that the concerns raised by Jamie demonstrated a need to ensure that all proper educational and therapeutic services were in place by the time A.J. moved to Hawaii, but critically, these did not rise to the level of justifying continued dependency jurisdiction. As the court explained: "These are issues, but they are not *protective* issues. And as far as we all would like or I would like the Court to be able to observe and to monitor, there is not a legal basis for doing this."[10] (Italics added.) Still, rather than immediately terminating jurisdiction, the court gave the parties almost an additional two months to ensure that all satisfactory arrangements for A.J.'s care and education in Hawaii had been successfully put in place before finalizing its order. That delay enabled the court to receive additional reports about how A.J. was faring in her new home. For this reason, Jamie's suggestion that the court's decision to terminate jurisdiction was unduly hasty also fails.

> B. *Jamie's Arguments Concerning the Role of the Interstate Compact on Placement of Children (ICPC) in the Court's Decision to Terminate Jurisdiction Are Unfounded*

Jamie argues that one of the reasons the trial court "hastily terminated jurisdiction" is that it was concerned if it did not do so, Hawaii would not accept placement of A.J. in that state, since the Agency had not yet complied with the procedures required by the ICPC, Family Code section 7901 et seq. The ICPC, Jamie argues, in fact posed no conflict that required the court to terminate jurisdiction. Had the juvenile court not misapprehended the impact of that law on this case, Jamie contends, it would have continued its jurisdiction to ensure the placement with Joshua posed no risks for A.J. We

---

[9] Jamie's reliance on *Austin P.* is misplaced. In that case, the nonoffending, noncustodial father and the stepmother had been aware of Austin's abuse by his mother, but had not taken steps to protect him. (*Austin P., supra*, 118 Cal.App.4th at p. 1134.) In addition, there was conflict among the father, stepmother and mother that does not exist here. (*Ibid.*) Finally, Austin was far more bonded with his mother than with his father, and wanted to reunify with her. (*Ibid.*) Here, by contrast, although A.J. clearly loves her mother, has bonded with her, and had some ambivalence about leaving her, she had grown very close to her father and expressed an "adamant" wish to live with him.

[10] According to Jamie, these statements indicate the juvenile court was conflicted about whether to place A.J. out of state without continuing court supervision. We disagree. In our view, the court was merely explaining the difference between matters requiring the ongoing attention and care of Joshua as the new custodial parent, and facts demonstrating the existence of risks to A.J.'s health and safety arising from that placement—risks that would justify retaining dependency jurisdiction. The record in this case shows the latter risks did not exist. Notwithstanding the natural desire of the court to monitor the situation to ensure that all would continue to go well for A.J., the court recognized it had no *legal* basis for maintaining that involvement.

reject these contentions as speculative and lacking factual support. Nothing in the record suggests the ICPC factored at all in the juvenile court's final decision to terminate jurisdiction. Moreover, as we have explained, the record otherwise supports the order terminating jurisdiction, regardless of any concerns the court may or may not have had about the role of the ICPC here.

■ The ICPC governs the interstate placement of children, and generally requires that no child may be sent to another state for placement "*in foster care or as a preliminary to a possible adoption*" unless the sending agency has first complied with the law's requirements. (Fam. Code, § 7901, art. 3, subd. (a), italics added.) There has been some debate about whether the ICPC applies to out-of-state placements with a *parent*. California law holds it does not. (See, e.g., *In re C.B.* (2010) 188 Cal.App.4th 1024, 1032 [116 Cal.Rptr.3d 294] [notice provisions of the ICPC do not apply to a placement with a parent]; Cal. Rules of Court, rule 5.616(b)(1)(A) ["A court . . . placing a child with his or her parent is not a placement requiring compliance with this rule."].) Most other states, however, apparently do apply the ICPC in the event of placement with a parent, at least if the sending court retains its jurisdiction. (See, e.g., Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2012 ed.) § 2.128[3], p. 2-373 ["If the court determines that a non-custodial parent is a non-offending parent and an appropriate caretaker, it may restore physical custody of the child to that parent and *dismiss its jurisdiction* without invoking the [ICPC]." (italics added)].) As one court observed, there are a number of "potentially thorny practical issues arising out of the lack of uniformity in this area." (*In re C.B., supra*, 188 Cal.App.4th at p. 1036 [mentioning, in particular, the potential illegality of California sending a child to live with a parent in an ICPC state without complying with the law].)

At the July 20, 2012, hearing during which the juvenile court granted Joshua's section 388 petition and set the contested disposition hearing, the court observed that "we don't have an ICPC or any arrangement in Hawaii for courtesy supervision." The Agency responded that if the court were to follow its recommendation and terminate jurisdiction "we would not have the issues with regards to ICPC," but "if . . . the Court ruled differently, then we would have to seek the assistance of Hawaii to try and expedite the ICPC under the circumstances." The court instructed the Agency to look into "whether or not Hawaii would object while the ICPC is pending to visitation or detention with the father in Hawaii."

During closing arguments at the disposition hearing, the Agency informed the court that A.J.'s social worker unsuccessfully attempted to contact CWS

in Hawaii to determine how it would view the placement of A.J. in Hawaii vis-à-vis the ICPC. The Agency nevertheless argued that Hawaii could "potentially view this as an illegal placement," and that A.J. "would be sent back to California if we place her there without an ICPC in place, which we don't have at this time." At that point, the court asked for clarification that this "would happen if this Court asked for courtesy supervision or some involvement from . . . Hawaii." The Agency responded affirmatively, adding if CWS did not provide courtesy supervision and the court retained jurisdiction, that would "force the [A]gency to monitor the case from afar," which in the Agency's view would constitute illegally practicing social work out of state.

Notwithstanding these exchanges, the juvenile court proceeded to issue its extensive factual findings and its tentative ruling that jurisdiction would be terminated, *without once referencing the ICPC.* The court also made no mention of the ICPC when it confirmed its decision to terminate jurisdiction in September 2012. The written orders reflecting the court's ruling terminating jurisdiction also make no mention of that law. Additionally, the Agency presented no definitive evidence substantiating its argument that CWS would not accept placement of A.J. in that state if jurisdiction were retained, or that CWS would refuse the Agency's request for courtesy supervision absent ICPC procedures.[11] Accordingly, Jamie's assertion that the court terminated jurisdiction in significant part due to potential ICPC complications lacks factual foundation in the record, even assuming the law favored termination of jurisdiction to avoid those complications.

Jamie argues, however, that the ICPC clearly was material to the juvenile court's ruling because, but for the concerns raised by that law, "it is likely the trial court would not have terminated jurisdiction" in view of the evidence showing Joshua's past brushes with the law, A.J.'s history of behavioral issues and the short time period Joshua has been in A.J.'s life. This argument, too, is pure speculation, and is belied by the court's explicit factual findings indicating that these matters posed no protective issues warranting continuing jurisdiction. We have concluded these findings are supported by substantial evidence, and Jamie's arguments regarding the ICPC give us no cause to revisit that conclusion.

---

[11] In its July 25, 2012, addendum report, the Agency included a statement from Kelly Key, San Diego County's ICPC liaison, who indicated that if no ICPC were in place, there would be no "obligation" for CWS to provide any support services, and "many jurisdictions will not comply" with a request for courtesy supervision. No declaration or other evidence from CWS was included in the record; however, far from indicating that a lack of cooperation was likely, CWS already had approved Joshua's home as suitable for A.J.'s placement.

## DISPOSITION

The order terminating jurisdiction is affirmed.

McDonald, J., and Aaron, J., concurred