Filed 6/26/14  In re E.P. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.P. a Person Coming Under the Juvenile Court Law. | H040334 (Monterey County Super. Ct. No. J47380) |
| MONTEREY COUNTY DEPARTMENT OF SOCIAL AND EMPLOYMENT SERVICES, Plaintiff and Respondent, v. E.P. et al., Defendants and Appellants. | |

The Monterey County Department of Social and Employment Services (Department) filed the underlying proceeding to bring the minor, E.P., within the jurisdiction of the juvenile court under Welfare and Institutions Code section 300.[1] Following a contested hearing, the court granted physical custody to E.P.'s previously noncustodial father (father) and terminated its jurisdiction.  Both the minor and the minor's mother (mother) appeal, contending that the juvenile court committed reversible error by terminating jurisdiction under section 361.2, subdivision (b)(1).  Mother further argues that the court erred by denying her reunification services.  For reasons explained below, we reverse and remand with directions.

---

[1] Further unspecified statutory references are to the Welfare and Institutions Code.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Father, a staff sergeant in the Air Force, currently is stationed at McConnell Air Force Base in Wichita, Kansas. He and mother became friends when he was stationed in Monterey, California. While mother and father were never romantically involved, they decided to have a child together and to share parenting responsibilities. After mother became pregnant in 2009, father was deployed. Mother stopped communicating with father and did not inform him when E.P. was born. Father learned about E.P.'s birth through social media, located mother through her relatives, and visited E.P. for the first time when the child was about two weeks old.

Father also visited E.P.--who was living in Salinas with mother, his maternal grandmother, and his maternal aunt--for approximately one week when the child was three months old, and again when the child was six months old. Father next saw E.P. when the child was three years old and mother took him to Texas to meet father's parents. Between visits, father stayed in touch with E.P. by Skype. Father, who was not on E.P.'s birth certificate, established his paternity in 2010. He has since paid back child support and has remained up to date on his support payments.

On March 12, 2012, father contacted the Department and reported that he was concerned that E.P. was not receiving adequate care from mother. At that time, the maternal grandmother and maternal aunt reported that mother went out drinking with friends and left E.P. in their care. The referral did not meet the standard for further investigation, and the family was referred to preventive services through Pathways to Safety.

### A. *The Dependency Petition*

On July 25, 2013, the Department received a second referral regarding E.P., this one from his maternal aunt. She reported that mother was not caring for E.P., instead leaving the child in the care of the maternal grandmother, and was neglecting E.P.'s medical needs, including a dental problem that had required a trip to the emergency

room.  A Department social worker interviewed the family.  Those interviews revealed that E.P. had significant tooth decay and developmental problems that mother had failed to address.  The maternal grandmother expressed concerns that mother did not spend much time with E.P., in part because she worked two jobs, but also because E.P. was not a priority for mother.  The maternal aunt stated that mother is often out drinking with friends.

The Department filed a juvenile dependency petition on E.P.'s behalf under section 300, subdivision (b) on August 15, 2013.  The court ordered E.P. detained the following day.  Mother agreed to move out of the family home so that E.P. could be placed with the maternal grandmother and maternal aunt.

### B. *Jurisdiction/Disposition Report*

The Department filed a jurisdiction/disposition report on September 26, 2013, in which it recommended sustaining the dependency petition, removing E.P. from mother, placing E.P. with father, and dismissing the dependency case.

The report stated that E.P.'s "medical and developmental needs have been seriously neglected."  Specifically, the report noted that two of E.P.'s teeth were black due to decay and he had been taken to the emergency room with an abscessed tooth in July 2013.  E.P. received seven root canals, four crowns, and an extraction after being removed from mother's care.  According to the report, mother blamed E.P.'s dental problems on father's failure to obtain insurance for E.P., while father stated that he could not put E.P. on his insurance because mother failed to provide him with E.P.'s birth certificate and social security number.  Father was unaware of the dental issues.

As to E.P.'s "extensive developmental delays," the report noted that E.P. was referred for audiology and speech pathology in April 2012, but that mother never followed through on the referrals.  At nearly age four, E.P. was not potty trained, could not identify colors or letters, and spoke only in two and three word sentences.

3

Father volunteers with children with special needs. He and his husband live in a home in Wichita. According to the report, father had determined that there would be space for E.P. in both the regular and the special needs child care programs at McConnell Air Force Base, should he get custody of E.P.

The Department did not recommend reunification services for mother because father was willing and able to take physical custody of E.P.

### C. *Family Mental Health Assessment*

Psychologist Katherine Donahue, Ph.D., performed a family mental health assessment, which was filed on October 2, 2013. In connection with that assessment, Dr. Donahue interviewed mother in person, interviewed father over the phone, observed a Skype visit between father and E.P., and met with E.P. Following an October 24, 2013, in-person interview with father, Dr. Donahue completed an addendum to the family mental health assessment.

Dr. Donahue reported that mother "failed to take responsibility for her role in the family's current dependency case, minimized the extent of the medical and dental neglect suffered by [E.P.], her use of alcohol, and the impact of her absences upon the well-being of her child." Dr. Donahue recommended that mother participate in mental health therapy, a psychiatric assessment to determine whether she might benefit from psychotropic medication, parenting classes, and parent-child therapy.

After administering E.P. a number of different tests, Dr. Donahue concluded the child met the diagnostic criteria for Autism Spectrum Disorder and recommended that he be further evaluated to determine beneficial services and interventions. Dr. Donahue opined that E.P.'s symptomatology of Autism Spectrum Disorder "has likely been exacerbated by the inconsistent presence of [mother] in his life."

After observing a Skype visit between father and E.P., Dr. Donahue stated it was "apparent they had an attachment." Dr. Donahue also observed an in-person visit and

4

concluded that father was "attuned to [E.P.'s] needs" and "nurtured positive growth through praise, physical affection, and direct communication" with E.P.

Father told Dr. Donahue that he had suspected E.P. was autistic for years, but that mother would get angry when he raised the issue. Dr. Donahue noted that father had "already established Autism resources in the Wichita area," "has acquaintances in the Autism community," and has some "fundamental knowledge of Autism." Dr. Donahue reported that she had no clinical concerns about placing E.P. with father.

### D.    *Jurisdictional and Dispositional Hearing*

The court held a contested jurisdictional and dispositional hearing on October 29 and 30, 2013. The jurisdictional/dispositional report, family mental health assessment, and addendum to the family mental health assessment were received into evidence. The court heard testimony from the maternal aunt, the Department social worker assigned to the case, mother, and father.

The social worker testified that she had observed an in-person visit between father and E.P. and that father's ability to manage and parent E.P. appeared to be "excellent." She opined that E.P.'s physical and emotional well-being would not be at risk if he were placed with father, but there would be a risk if he were placed with mother.

At the court's direction, the social worker contacted father's husband after the October 29, 2013 proceedings. Prior to the proceedings on October 30, 2013, the social worker filed a letter summarizing her interview with the husband. She indicated that father's husband had not met E.P. but that he expressed a commitment to raising a special needs child with father and that he had significant parenting experience, as he has a 10-year-old son and had been a licensed foster parent for several years.

### E.    *Decision and Notices of Appeal*

At the conclusion of the hearing on October 30, 2013, the court announced its decision. Finding E.P. had been "severely neglected," the court sustained the petition,

5

ordered E.P. removed from mother's custody and placed with father, and terminated its jurisdiction. The court entered judgment the same day.

Both E.P., through his trial attorney, and mother timely appealed.

## II.   DISCUSSION

### A.   *The Statute*

Section 361.2, subdivision (a), requires the juvenile court to place a dependent child with a previously noncustodial parent who requests custody, unless the placement would be detrimental to the child's safety, protection, or physical or emotional well-being. Because the noncustodial parent has a constitutionally protected interest in custody, case law requires clear and convincing evidence of detriment to the child before the court can deny the noncustodial parent's request for custody. (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1828.) With its heightened standard of proof, this provision effectuates the legislative preference for placement with the previously noncustodial parent. (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1132.)

If the child is placed with the noncustodial parent, section 361.2, subdivision (b) gives the juvenile court three options. It may (1) order that the previously noncustodial parent become legal and physical custodian of the child and terminate its jurisdiction over the child; (2) order that the previously noncustodial parent assume custody subject to the jurisdiction of the juvenile court and require that a home visit be conducted within three months; or (3) order that the previously noncustodial parent assume custody subject to the supervision of the juvenile court. (*In re Abram L.* (2013) 219 Cal.App.4th 452, 461; § 361.2, subd. (b).) The decision whether to terminate jurisdiction or continue supervision is committed to the juvenile court's "very broad" discretion. (*In re Sarah M.* (1991) 233 Cal.App.3d 1486, 1496.) However, "before terminating its jurisdiction, the juvenile court must make a factual finding that supervision is no longer necessary." (*In re Austin P.*, *supra*, 118 Cal.App.4th at p. 1134; *In re Sarah M.*, *supra*, at p. 1496, disapproved on other grounds by *In re Chantal S.* (1996) 13 Cal.4th 196, 204.)

6

### B.    Standard of Review

We review the decision to terminate dependency jurisdiction for an abuse of discretion.  (*In re J.S.* (2011) 196 Cal.App.4th 1069, 1082; *In re A.J.* (2013) 214 Cal.App.4th 525, 535, fn. 7.)  When a decision is "committed to the sound discretion of the juvenile court, [its] ruling should not be disturbed on appeal unless an abuse of discretion is clearly established."  (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318.)  To warrant reversal, the challenged determination must exceed the bounds of reason.  (*Id*. at pp. 318-319.)

We review the court's factual findings--including its underlying finding as to the need for continuing supervision--for substantial evidence.  (*In re A.J.*, *supra*, 214 Cal.App.4th at p. 535, fn. 7; *In re Austin P*., *supra*, 118 Cal.App.4th at p. 1134 [appellate court reviewed record for substantial evidence indicating whether there was a need for continuing supervision].)  "Under the substantial evidence rule, we have no power to pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or determine where the weight of the evidence lies."  (*In re Diamond H*. (2000) 82 Cal.App.4th 1127, 1135, disapproved on another point in *Renee J*. *v*. *Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6; see also, e.g., *In re Nada R*. (2001) 89 Cal.App.4th 1166, 1177.)  "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the finding or order."  (*In re Diamond H*., *supra*, at p. 1135.)

### C.    Termination of Jurisdiction

E.P. and mother argue that--in view of E.P.'s developmental difficulties and his previously limited relationship with father, with whom he has never lived--the court erred by immediately terminating its jurisdiction after granting physical custody to father. Mother maintains that the court failed to make the requisite need-for-supervision finding and that substantial evidence does not support a finding that supervision was not required. E.P. argues the court abused its discretion by terminating its jurisdiction.

Prior to issuing its decision, the court heard argument from mother's attorney about the need for ongoing supervision. The court then adopted the findings in the Department's jurisdiction/disposition report, including the finding that "[c]ontinued court supervision of the child is not necessary to protect the child." Accordingly, the court made the requisite finding that supervision was unnecessary before terminating its jurisdiction.

However, that factual finding is not supported by substantial evidence. Courts have recognized that "supervision may be appropriate in lieu of or before terminating jurisdiction" (*In re Sarah M*., *supra*, 233 Cal.App.3d at p. 1497) where there are concerns that the "new custodial parent may need services." (*Id*. at p. 1496.) That concern certainly is present here, given E.P.'s significant, as-yet undiagnosed and untreated developmental issues, which may include Autism Spectrum Disorder. While the record indicates that father has educated himself about autism and plans to enroll E.P. in a child care program, there is no evidence as to whether father intends to have E.P. formally evaluated, as recommended by Dr. Donahue. Nor is there evidence as to whether appropriate treatment is available in Wichita. Assuming it is, the record does not disclose whether father will in fact obtain such treatment for E.P. The record shows that father has spent limited time with E.P. and has not been solely responsible for the child for more than a few hours at a time. While Dr. Donahue and the social worker expressed no concerns about placing E.P. with father, their conclusions were based on observing father and son together for just one hour. Father's husband has not even met E.P., nor was he evaluated by Dr. Donahue or interviewed in person by the social worker. While the social worker's phone call with father's husband suggests he may be a positive influence in E.P.'s life, more evidence in needed to support such a finding. In sum, the current record does not support the court's determination that there was no need for continued supervision. To the contrary, the evidence--including E.P.'s sporadic and limited contact with father and his significant medical issues--point to a need for continued court

8

supervision.  Because the evidence does not support the court's finding that supervision is not required, it follows that the court abused its discretion by terminating its jurisdiction.

### D.    *Reunification Services*

Mother also urges that the court erred by denying her reunification services.

Section 361.2, subdivision (b)(3) provides that where the court orders that the previously noncustodial parent assume custody *subject to the supervision of the juvenile court* it "may order that reunification services" be provided to one or both parents, including "the parent or guardian from whom the child is being removed."  By contrast, there is no requirement that the formerly custodial parent be offered reunification services where the juvenile court terminates jurisdiction under section 361.2, subdivision (b)(1). (*In re Janee W*. (2006) 140 Cal.App.4th 1444, 1455.)  This makes perfect sense, as " '. . . the purpose of reunification services is to facilitate the return of a dependent child to *parental* custody,' [and] . . . when a child is placed in parental custody, this goal has already been met and therefore reunification services are not necessary."  (*In re Erika W*. (1994) 28 Cal.App.4th 470, 478.)[2]

Here, the court's decision not to order reunification services apparently was based on its erroneous decision to terminate its jurisdiction.  Given our conclusion that the court should have continued its jurisdiction over E.P., on remand, the court should exercise its discretion under section 361.2, subdivision (b)(3) to determine whether to order that reunification services be provided to mother.

---

[2] There is no merit to mother's contention that the court erroneously believed it lacked the authority to order reunification services.  The court did state, somewhat ambiguously, that it lacked the authority to provide mother services "under the facts." However, any question whether the court understood that it could offer mother services is dispelled by the court's statement that "[t]he question is whether or not services should be extended to the mother," which the court expressly recognized to be "an option as well . . . while the child is placed with the non-offending parent."

## III.   DISPOSITION

The order terminating jurisdiction is reversed and the matter is remanded.  The juvenile court is directed to hold a hearing addressing the issues of continued supervision and reunification services.  The court is further directed to render a decision addressing those issues based on the facts as they exist at the time of the hearing.

_____
                                        Premo, Acting P.J.

WE CONCUR:

_____
        Elia, J.

_____
        Mihara, J.