Filed 3/2/26  In re K.B. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re K.B., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. H.B., Defendant and Appellant. | D086951 (Super. Ct. No. J521616) |

APPEAL from an order of the Superior Court of San Diego County, Lilys D. McCoy, Judge.  Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Damon M. Brown, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel and Evangelina Woo, Deputy County Counsel, for Plaintiff and Respondent.

Appellant H.B. (Mother) appeals[1] from an order maintaining the juvenile court's jurisdiction over K.B. (Child), entered at the jurisdiction and disposition hearing.  Mother contends only that the juvenile court erred when it maintained jurisdiction in contravention of the San Diego County Health and Human Services Agency's (the Agency) recommendation.  We conclude the court did not abuse its discretion in maintaining jurisdiction over Child under Welfare and Institutions Code section 300, subdivision (b)[2] and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Child lived with Mother, Father, and half-sibling in Virginia until January 2025.  While the family was in Virginia, Mother's use of alcohol prompted at least eight calls for service between December 2020 and January 2025, including an arrest for driving under the influence.

The record is not clear whether Mother and Father separated when Mother moved with the children to San Diego in 2025.  Although Father stated he and Mother were separated, neither has filed for legal separation or divorce.  Both parents expressed that they wanted to be together as a family in San Diego.  Either way, after Mother moved with Child and his half-sibling, Mother's relationship with alcohol continued to cause problems.  Child reported the need to hide from Mother when she had been drinking.

On April 10, shortly after beginning school, Child explained that he was having a hard time sleeping due to Mother's behavior; staff also confirmed that Child did not have lunch most days.  The Agency closed out

---

[1]    E.B. (Father) is Child's stepfather and is not a party to this appeal.

[2]    Further undesignated statutory references are to the Welfare and Institutions Code.

the ensuing report because Mother reportedly returned to rehab in April 2025. When the Agency received an additional referral just days later, it was again evaluated out, this time because the children were expected to live in Virginia with Father.

On May 6, 2025, Child video called Father about Mother's behavior. Father observed Mother berating and chasing the children. She also stated the children should not be alive because she believed life was "pointless." Nevertheless, Father told police that the children were "antagonizing" Mother. Father instructed the 10-year-old Child to walk to a maternal aunt's house for safety. Child later explained to school staff that Mother was so drunk, she did not recognize him. Child understood that Father was traveling from Virginia to retrieve both himself and his half-sibling; however, Father left Child with Mother in San Diego. Child said that Father usually took his half-sibling when Mother was "going crazy," leaving Child to handle her moods alone. Father reported seeking family law orders in Virginia to "be protective of the half-sibling" but did not similarly move to protect Child.

On May 11, Mother made an evidently false report to Virginia police that Father sexually assaulted Child's half-sibling. The officer that spoke with Mother believed her to be heavily intoxicated based on her delayed and slurred responses, and he was unable to corroborate Mother's claims. When he reported his findings to Mother, she "stated that everything was fine and that [the half-sibling] was fine." Also on that day, Child returned from walking the dog and encountered Mother, who was drunk, yelling on the phone. When he began to feel unsafe, Child left the home for the aunt's house. Mother had confiscated Child's phone so he was unable to call Father. Unbeknownst to Child, the aunt traveled outside of San Diego and was not

3

available to support him. Child waited for the aunt between two and five hours outside the aunt's home before setting out for home.

As best we can discern, Mother called for police assistance approximately two hours after Child left the home.[3] When they arrived, they determined she was intoxicated, although Mother asserted she had not consumed alcohol that day. Despite her own reported sobriety, Mother was unable to describe Child to the officers and began using racial slurs and throwing things at the officers. The officers left the residence, endeavoring to search for Child. They eventually encountered Child, who disclosed that he had not eaten. He accepted dinner from the officers before they transported him to Polinsky Children's Center (Polinsky). When asked how Child would rate his feeling of safety at home on a scale of zero to ten, he gave it a " '0' or '-100.' " He disclosed that Mother called him explicit names, "like cunt, bitch and whore, while drunk," and he did not believe rehab helped Mother.

Mother attempted to collect Child from Polinsky. Child did not wish to see her or leave Polinsky and Mother returned home without him. When she spoke with a social worker later, the social worker believed her to be intoxicated and belligerent. Child was later released to Father.

Father's safety plan for Child consisted of contacting Mother's rehab and removing Child from the home, believing living separately to be sufficient. He equivocated as to whether or not he and the children would continue to live separately from Mother. Indeed, Father expressed that his move with the children to San Diego "depends on the judge" and observed that if the dependency case closed, moving "would depend on family court," and that generally "everything is contingent on the case closing and being

---

3      Mother contends she waited only 20 minutes.

able to proceed to the next step." He later again explained that "[e]verything is contingent on the Court" highlighting the challenge of having "two houses in [California]." However, Father did not believe anything beyond living separately was necessary to create safety for Child, and both parents looked forward to the court removing supervision restrictions for Mother. Similarly, Mother's relapse plan consisted of calling her sponsor and returning to rehab.

After Child's evaluation, it was recommended Child receive "high/medium level behavior support services similar to . . . individual therapy." Initially, Father agreed that Child should access mental health support services. However, he changed his mind and said he would look into it only if Child started doing poorly in school.

Given that Father resided in Virginia, the court took temporary jurisdiction, ordered continued detention, and mandated Mother's visitation with Child be supervised. However, the family did not often spend time together, challenged by the supervision requirement, travel difficulties, and Mother's relapses. Even virtual communication remained sporadic. While Child was in Father's care in Virginia, there were no additional safety concerns. Given that stability, the Agency recommended closing the case, with orders for Father to obtain custody of Child.

Child's counsel sought to keep the case open and maintain court oversight. The court sustained the petition and asserted jurisdiction over Child under section 300, subdivision (b). Consistent with Child's counsel's request, the court declined to make custody exit orders and kept the case open, highlighting Mother's increasingly frequent intoxication and erratic behavior toward Child. The court was also concerned about Mother's lack of insight and failure to address her problematic use of alcohol, observing that Mother believed exposure to her faults "builds . . . character" in her children.

5

As to Father, the court observed he was aware of Mother's problem with alcohol and witnessed her behavior toward the children but nevertheless described them as "antagonizing" Mother. Father left Child with Mother, taking only the half-sibling back to Virginia, and avowed he had no safety concerns despite hearing Mother wished the children harm and witnessing her chase them around. Further, the court was concerned about Child's exposure to adult topics such as Mother's bipolar diagnosis, parentification, and Father's decision not to follow through with mental health services for Child or participate in greater safety planning. In line with those concerns, the court elected to move forward "in a way that's protective to [Child]" and continued its jurisdiction.

## DISCUSSION

Section 361.2 governs the placement of a child following removal from parental custody. Under section 361.2, subdivision (b), if the court determines placement with the previously noncustodial parent is not detrimental, the court then decides whether there is a need for ongoing supervision. If the court determines there is no need for ongoing supervision, the court grants custody to the noncustodial parent, provides reasonable visitation to the previously custodial parent, and terminates jurisdiction. (§ 361.2, subd. (b)(1).) If the court terminates jurisdiction, it is contemplated that any further proceedings will take place in the family court. (*In re J.S.* (2011) 196 Cal.App.4th 1069, 1077.) Alternatively, the court may order that the noncustodial parent assume custody subject to juvenile court jurisdiction. (§ 361.2, subd. (b)(2); *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1130.)

The reviewing court applies the substantial evidence test when reviewing whether it was detrimental to place a child with the previously noncustodial parent. (*In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1507.)

6

Here, the parties agree that placement with Father was appropriate. However, they disagree over whether the court abused its discretion in maintaining jurisdiction over the noncustodial placement with Father for a period of supervision pursuant to section 361.2, subdivision (b)(2). We review the challenged order for an abuse of discretion. (*In re A.J.* (2013) 214 Cal.App.4th 525, 535, fn. 7.) We do not disturb a discretionary decision unless the juvenile court's decision was arbitrary, capricious, or patently absurd. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

The juvenile court provided a reasoned explanation for maintaining jurisdiction, highlighting the repeated incidents that led to the case and Mother's failure to address them or create a proactive relapse plan. Mother did not believe she needed to change her behavior and believed exposure to it built character in her children. She did not believe she needed to "fix" anything, despite her numerous trips to rehab and multiple contact with law enforcement related to her use of alcohol.

Mother argues that Father was taking appropriate care of Child and that the court should have, therefore, terminated jurisdiction. However, the record belies this argument. Of note, some referrals regarding Mother's behavior were evaluated out because it was unclear who had the children and who would be caring for them in the long term. While Father was in Virginia, he was unsuccessful in keeping Child and, at least once, blamed the Child and his half-sibling for Mother's actions. In Father's absence, the children barricaded themselves in rooms to escape Mother. The safety plan he created for Child failed on May 11, prompting Child to be unsupervised for up to five hours with no means to contact a trusted adult. Even after Father was able to take Child to Virginia following his detention, he chose to not enroll him in mental health services as recommended.

Significantly, both parents have indicated they might live together in San Diego in the future. While Mother now argues there are no definitive plans for their reconciliation, Father twice implied their reunification is dependent on whether or when the court terminates jurisdiction. Beyond that implication, both parents have stated their intention is to live together as a family. On this record, we conclude the juvenile court's decision to maintain jurisdiction under section 361.2 was not arbitrary, capricious, or patently absurd.

## DISPOSITION

The juvenile order maintaining jurisdiction is affirmed.

IRION, Acting P. J.

WE CONCUR:

DO, J.

CASTILLO, J.

8