Filed 9/29/15 Christopher B. v. Superior Court CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CHRISTOPHER B.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN FRANCISCO COUNTY,<br><br>        Respondent;<br><br>SAN FRANCISCO HUMAN SERVICES AGENCY, et al.,<br><br>        Real Parties in Interest. | A145495<br><br>(San Francisco Super. Ct. Nos. JD14-3227 & JD14-3228) |

In this juvenile writ proceeding, Christopher B. (father) seeks extraordinary relief from the juvenile court order terminating reunification services with respect to his two daughters—S.M. (born May 2009) and C.B. (born July 2012)—and setting a permanency planning hearing pursuant to section 366.26 of the Welfare and Institutions Code.[1] Specifically, father claims that the juvenile court erred in concluding that there was no substantial probability that the girls could be returned to his care by the 12-month review date if reunification services were continued. Father further contends that the juvenile court should have exercised its discretion to continue services for this sibling group as permitted by section 366.21, subdivision (e), given the extraordinary circumstance that

_____

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified. All rule references are to the California Rules of Court.

1

father experienced the death of his infant son O.B. during the reunification period. While the death of a child is undeniably tragic and father has our heartfelt sympathy, we cannot say on these facts that the juvenile court abused its discretion in terminating father's reunification services with respect to his two daughters. In addition, the court's substantial probability finding was amply supported by the evidence. We therefore deny the petition.

## I. BACKGROUND

C.B. and S.M., the minors who are the subject of these proceedings, are part of a larger sibling group that has been known to the San Francisco Human Services Agency (Agency) for many years. Specifically, mother has been the subject of approximately 17 child welfare referrals since 2000 involving allegations of neglect, caretaker absence/incapacity, and physical abuse. The family received voluntary services through the Agency on three separate occasions between 2003 and 2011. Further, mother participated in both family maintenance and family reunification services in a dependency proceeding involving her son J.T. (born May 1998) from September 2010 to December 2012, but failed to reunify.[2] In addition, two previous dependency petitions were filed in 2010 and 2011 with respect to S.M. and two of her half-siblings, D.T. (born August 1996) and M.H. (born November 2002). Mother received family maintenance services from April 2011 to November 2012, presumably in connection with the latter of these two petitions.

According to Christopher B., he has lived in the family home since June 2010, while many of these prior dependency proceedings were pending. He is the presumed father of C.B. and is believed to be her biological father. Although he is not S.M.'s biological father, he claims to have supported her and held her out as his own child since she was a young girl. On August 20, 2014, the juvenile court found Christopher to be S.M.'s presumed father. Finally, in December 2013, mother gave birth to O.B.

_____

[2] J.T.' s dependency was dismissed in March 2014 after he became a juvenile court ward pursuant to section 602.

Christopher was O.B.'s presumed father and is believed to have been his biological father.

Most recently, the Agency became involved with this family in June 2014 due to concerns that mother and father were unable to meet O.B.'s significant medical needs. O.B. had a highly complex congenital heart condition and had been hospitalized since his birth. He had undergone two major open heart surgeries and would require a third. According to members of O.B.'s care team, the majority of infants with similar medical conditions and medications go home when they are around three months old. Father, however, failed to attend the necessary home care teaching in March 2014. Further, although mother was present, she was discovered asleep at O.B.'s beside and was difficult to rouse, despite the fact that the infant was crying and his bedside alarms were going off. Given the minor's medically fragile state and the parents' lack of follow through, the decision was made to keep O.B. in the hospital through his second surgery in May 2014.

The hospital was again getting ready to discharge O.B. in June 2014. However, he would be sent home on oxygen, with six medications and a feeding tube. Reportedly, his condition was so fragile that a medication dose given beyond 30 minutes of its scheduled time could be fatal. The hospital was concerned that mother was not consistently visiting the minor and making herself available to be trained in the highly specialized care O.B. would require. Moreover, mother's whereabouts were unknown from June 4 through 12, and it was reported that mother had showed up at the hospital at other times " 'stoned' " and smelling of marijuana.

As for father, his hospital visitation privileges had been terminated in February 2014, after a number of warnings regarding his behavior. Specifically, in December 2013, father was warned regarding his outbursts on the unit. In January 2014, security was contacted after father became verbally aggressive with mother at O.B.'s bedside. On February 1, 2014, father was twice removed from the hospital by security after becoming verbally aggressive with mother. According to members of O.B.'s care team, "[t]he parental discord was so extreme it threatened other parents and children in the hospital."

Although attempts were made to have the parents visit separately, father kept showing up with mother and was disruptive. After father's visitation was restricted, he reportedly made repeated, harassing phone calls to the unit.

Meetings were arranged for April 11, April 17, and May 1 with hospital administration and security to discuss possible reinstatement of father's visitation, but father failed to attend. When he finally did attend a May 22 meeting, father was unable to take responsibility for his past actions and exhibited verbally abusive and disruptive behavior, leading hospital staff to conclude that a change to his visitation privileges was not warranted. On that same date, both mother and father refused to sign a necessary surgical consent for O.B., unless father was allowed to visit. Because O.B.'s doctor was concerned that they were losing the "optimum window of opportunity to do the surgery," the hospital was required to seek a court order authorizing the procedure.

On June 19, 2014, the Agency social worker visited the family home to assess its appropriateness for O.B. and the other minors. Father, however, refused her entry. In addition, although both parents were informed about a team decision meeting to be held on June 23 to discuss O.B.'s discharge plan, neither parent attended. According to mother, neither she nor O.B. had any need for Agency services. When she was finally reached by telephone on June 23, she reiterated this position.

Thus, on June 27, 2014, the Agency filed dependency petitions under subdivisions (b), (c), (g), and (j) of section 300 with respect to the five children remaining in mother's custody. The petitions alleged that S.M. and C.B. (along with their siblings D.T., M.H., and O.B.) were at risk of harm due to mother's substance abuse; her history of neglect and failed child welfare involvement; father's substance abuse and criminal history;[3] the inability or unwillingness of mother and father to care for medically fragile O.B.; the

---

[3] The Agency's June 2014 detention report listed the following recent arrests for father: trespassing/occupying property without consent (February 2014); possession of unlawful paraphernalia, possession of marijuana, and petty theft (November 2014); and inflicting corporal injury on a spouse/cohabitant and petty theft (October 2013). Father also showed a misdemeanor conviction for petty theft in September 2013 and was reported to be on probation through September 2016.

4

parents' issues with domestic violence; and their failure to attend to C.B.'s medical needs, in that the two year old reportedly also had a heart condition that required assessment and had not been seen by her primary care physician in over a year.[4] Initially, the Agency sought detention only of O.B., who remained in the hospital.

On June 30, 2014, O.B. was ordered temporarily detained and mother and father were granted separate, supervised visitation. On July 8, 2014, the juvenile court confirmed the prior detention order, giving the Agency discretion to release O.B. to a relative on 24-hour notice. The Agency subsequently supervised several visits between father and O.B. at the hospital. The visits were reported to be uneventful, although father concluded both visits before the end of the allotted two hours.

Thereafter, while jurisdiction and disposition were pending, the Agency detained C.B. and S.M. on August 5, 2014, placing them in the home of the paternal grandmother.[5] According to the Agency, there had been an incident of reported domestic violence on July 18, 2014, between the parents. Specifically, father—bare chested and with a bandana on his face—reportedly jumped on the car of M.H.'s father and head-butted mother. The oldest minor, D.T., then hit father in the face, possibly in defense of mother. According to M.H., who was present during the altercation, this type of confrontation had occurred in the past. Mother, however, denied the reports and maintained that there was no domestic violence in her relationship with father, this despite the fact that the incident happened outside of the family home with housing security present.

The social worker met with the parents, M.H., C.B., and S.M. at their home on July 18, the date of this incident. Subsequently, the social worker learned that the paternal relatives had picked up C.B. on that date and had been caring for her since that time. The parents had not been in contact, and the paternal relatives had no way to reach

---

[4] Mother had various excuses for failing to follow through with C.B's medical care. In January 2014, she stated that C.B. had missed her most recent check-up because father had failed to take her while the minor was in his care, despite the fact that mother had told him about the appointment.

[5] This is a non-relative, extended family member (NREFM) placement for S.M. as Christopher B. is her presumed, but not her biological, father. (See § 362.7.)

5

them regarding the minor's care. Similarly, a family friend, A.V., disclosed that she often cared for S.M. for extended periods; that S.M. had been with her since around July 18; and that she did not know mother's whereabouts or have any way to contact her. Finally, according to M.H.'s father, he had been caring for M.H. since July 18. The Agency asked the paternal grandmother to pick up S.M. on August 4, 2014, so that the girls could be together in a home that had been assessed by the Agency. On August 7, 2014, the Agency filed first amended petitions for S.M. and C.B., adding to the existing allegations an allegation related to their abandonment by mother and father. The juvenile court formally detained both minors the next day.

In its August 15, 2014, dispositional report, the Agency, while acknowledging the stress on the family caused by O.B.'s medical condition, opined that mother and father "have not demonstrated they can provide specialized care for [O.B.] and have not been able to provide consistent basic care for the other children." The upkeep on the family home was reported to be "barely marginal." Moreover, mother was frequently absent from home for extended periods of time for unknown reasons. Although father reportedly provided parenting for the children during these periods, mother was now claiming that he no longer lived with the family. The Agency also expressed concern regarding the indications of domestic violence in the parents' relationship. It identified as risk factors for S.M. and C.B. these domestic violence concerns as well as the extended absences of the parents from the home. The Agency also stated that the parents needed time to "exhibit stability through ruling out a substance abuse problem and participating in services."

On September 23, 2014, the juvenile court, after significant revision, sustained the allegations in the first amended petitions, finding C.B. and S.M. to be persons described by subdivisions (b) and (j) of section 300. On October 23, 2014, the court confirmed father's previous submission on jurisdiction, declared the minors to be juvenile court dependents, and ordered reunification services for both parents. Father's reunification services included substance abuse assessment and testing; providing contact information and remaining in contact with the social worker; engaging in a program of individual

6

therapy targeting issues of domestic violence and anger management; and following through with medical care for C.B. C.B. and S.M. remained in the home of the paternal grandmother/NREFM where they were doing well.[6]

Upon O.B.'s release from the hospital, he was placed in the home of his paternal grandmother. Unfortunately, due to his serious health condition, he was in and out of the hospital during this placement. He was hospitalized from December 15 through December 20, 2014, for respiratory distress, likely due to pneumonia and heart failure. He was readmitted to the hospital on December 28, where he subsequently died on January 1, 2015. On February 10, 2015, the Agency filed a section 388 petition and related dismissal report, informing the court of these sad circumstances and seeking dismissal of O.B.'s dependency action. The juvenile court dismissed O.B.'s dependency on February 26, 2015.

Thereafter, on April 3, 2015, the Agency filed a status review report in advance of the scheduled six-month hearing, recommending termination of reunification services for both parents with respect to S.M. and C.B. because the "parents have failed to actively engage in services and complete their reunification requirements although numerous reasonable efforts were [made] to assist and support them." With respect to father, referrals were repeatedly made to the Homeless Prenatal Project (HPP) beginning in July 2014 for a substance abuse assessment, fatherhood group, and domestic violence services. Father was also referred to be drug tested. At O.B.'s funeral in January 2015, father told the social worker that he wanted to begin engaging in his reunification services. At a parent meeting on January 13, 2015, the social worker went over the reunification requirements and urged the parents to start actively participating in services. However, when the social worker tried to meet with father at the paternal grandmother's

---

[6] With respect to the other minors, D.T. turned 18 in August 2014, and thus the Agency requested that her dependency be dismissed. M.H. remained in the home of her father, and a family maintenance plan was recommended. O.B. remained hospitalized with a plan to be placed with his paternal grandmother upon his release. He was described as a "happy, social and physically active chubby baby."

home in March 2015 and April 2015, he refused. In addition, although he was required to provide contact information to the social worker, father refused to provide a physical address and was reachable only by telephone. The social worker, however, believed that father was still living with mother because they appeared to be in "constant contact" with each other.

Finally, on May 7, 2015, father did an intake assessment at the HPP. Soon thereafter, he spoke at length to the social worker during S.M.'s birthday party. Specifically, he reported that he was working on his GED, had kept a follow-up appointment at the HPP, and was supposed to be going to the Fatherhood Support Group. By the June 9, 2015, contested six-month review hearing, father had reportedly met with the HPP a third time and was scheduled to begin individual therapy. However, he still was not drug testing.

In the meantime, both S.M. and C.B. were reported to be "happy, healthy, thriving, and content" in the home of the paternal grandmother, who had indicated her willingness to provide the minors with legal permanence if the parents were unable to reunify. This placement—described by the Agency as "loving" and "appropriate"— allowed C.B. and S.M. to have regular access to their many siblings and other relatives. Moreover, the paternal grandmother was also supervising visitation between the minors and their parents, which was reported to be going smoothly. At the June 9 contested hearing, the social worker testified that father was visiting regularly, stating: "I know he visits regularly. I couldn't say whether it's two times a week. But I have been told he is there regularly and he does assist from time to time with the kids."

At the conclusion of the contested six-month review hearing on June 9, 2015, the juvenile court terminated reunification services and scheduled a permanency planning hearing for October 14, 2015. In reaching its decision to terminate services, the juvenile court noted that the only testimony presented at the hearing was from the social worker. It went on to conclude: "I am not of the view that I can make a finding of a substantial probability of return based on again what's been presented to me this morning. And maybe there was more out there, but it's not before me." Further, although it

acknowledged father's "very recent efforts" and indicated it was "glad to learn" of them, the juvenile court expressly found that both parents had failed to regularly participate and make substantive progress in their cases plans. Rather, the extent of father's progress toward alleviating or mitigating the causes necessitating placement of the minors was characterized as "minimal."

Father subsequently filed a timely notice of his intent to file a writ petition, and the petition itself was filed on August 12, 2015.[7] (Rules 8.450(e), 8.452.)

## II. TERMINATION OF REUNIFICATION SERVICES

In the present case, C.B. was under three years of age when she was removed from the physical custody of her parents on August 5, 2014. Pursuant to section 361.5, subdivision (a)(1)(B), reunification services may be limited to six months for these very young minors. (See *M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 175 [the developmental needs of infants and toddlers justify establishing permanency earlier in proceedings when there is a poor prognosis for reunification].) Moreover, because S.M. is a member of C.B.'s "sibling group," her reunification services may be similarly circumscribed pursuant to section 361.5, subdivision (a)(1)(C).[8]

Specifically, at a six-month review hearing held in accordance with section 366.21, subdivision (e), reunification services for members of a sibling group may be

---

[7] Through clerical error, the form notice of intent provided by the juvenile court to father named only S.M. Upon discovery of this error, father's counsel filed a notice of intent covering C.B. However, this second notice of intent was untimely. By order dated August 18, 2015, we disregarded the second notice of intent, but deemed the first notice sufficient to permit review by this court of both minors' setting orders.

[8] Subdivision (a)(1)(C) of section 361.5 provides as follows: "For the purpose of placing and maintaining a sibling group together in a permanent home should reunification efforts fail, for a child in a sibling group whose members were removed from parental custody at the same time, and in which one member of the sibling group was under three years of age on the date of initial removal from the physical custody of his or her parent or guardian, court-ordered services for some or all of the sibling group may be limited as set forth in subparagraph (B). For the purposes of this paragraph, 'a sibling group' shall mean two or more children who are related to each other as full or half siblings." In this case, although Christopher B. was found to be S.M.'s presumed father, he acknowledges that he is not her biological father. Thus, S.M. and C.B. are half-siblings.

9

terminated, and a permanency planning hearing scheduled, if the juvenile court "finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan." Here, the juvenile court made the required finding before terminating father's reunification services with respect to both C.B. and S.M., and father does not challenge the propriety of this determination. Rather, father argues that his reunification services should not have been terminated because: (1) there was a substantial probability that the girls could have been returned to his care by the 12-month review date; and (2) the juvenile court should have exercised its discretion to continue services to C.B. and S.M. pursuant to section 366.21, subdivision (e). We address each contention in turn.

**A.  *Substantial Probability of Return***

The presumptive rule for children under the age of three on the date of initial removal (and for members of a "sibling group" which includes such a child) is that reunification services will be provided for a period of six months from the date of disposition.  (§ 361.5, subd. (a)(1)(B) & (C).)  Pursuant to subdivision (e) of section 366.21, however, even when a "sibling group" like C.B. and S.M. is involved, the juvenile court must still continue reunification services to the 12-month permanency hearing if it concludes that there is a "substantial probability" that members of that sibling group may be returned to a parent "within six months."  This statutory language has been interpreted to mean that additional services are warranted if there is a substantial probability of return by the 12-month permanency hearing, which must be held within 12 months from the date the dependent minor entered foster care.  (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 846 (*Tonya M.*); see § 366.21, subd. (f); rule 5.710(c)(1)(D) [court must continue the case to the 12-month permanency hearing if court finds "a substantial probability that the child may be returned within 6 months or within 12 months of the date the child entered foster care, whichever is sooner"].)

The "date a child enters foster care," is not, as might intuitively be presumed, the date that the minor was initially detained.  Rather, it is a term of art defined by section 361.49 as follows:  "[A] child shall be deemed to have entered foster care on the earlier

10

of the date of the jurisdictional hearing held pursuant to Section 356 or the date that is 60 days after the date on which the child was initially removed from the physical custody of his or her parent or guardian." Here, C.B. and S.M. were removed from their parents on August 5, 2014, and the jurisdictional hearing was completed on October 23, 2014. Thus, they "entered foster care" for purposes of the statute on October, 4, 2014, 60 days after their initial detention. Under these circumstances, at the six-month review held on June 9, 2015, continuation of services was appropriate if there was a substantial probability that the minors could be returned to father within the next four months—i.e., by October 4, 2015.

A juvenile court making a substantial probability determination with respect to a sibling group at a six-month review is instructed by court rule to consider a number of factors, "along with any other relevant evidence." (Rule 5.710(c)(1)(D)(i).) These express factors include: (1) "[w]hether the parent or legal guardian has consistently and regularly contacted and visited the child;" (2) "[w]hether the parent or legal guardian has made significant progress in resolving the problems that led to the removal of the child"; and (3) "[w]hether the parent or legal guardian has demonstrated the capacity and ability to complete the objectives of the treatment plan and to provide for the child's safety, protection, physical and emotional health, and special needs." (Rule 5.710(c)(1)(D)(i)(a)-(c).) Within this context, the juvenile court must decide whether, if reunification services were to continue, reunification within the statutory period would be "sufficiently probable." (*Tonya M.*, *supra*, 42 Cal.4th at p. 848.)

At the conclusion of the June 9, 2015, six-month hearing in this case—after reviewing the Agency reports and hearing testimony from the social worker—the juvenile court stated: "I am not of the view that I can make a finding of a substantial probability of return based on again what's been presented to me this morning. And maybe there was more out there, but it's not before me." We review the juvenile court's substantial probability determination for substantial evidence (*Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1028), and see no error under the facts of this case.

11

Indeed, other than citing us to the wrong statute and court rule, father's attorney makes no meaningful argument supporting her contention that the court's substantial probability finding was flawed, merely reiterating her assertion (which we address later) that the juvenile court had discretion to continue services even without such a finding. Given this lack of reasoned analysis, we could refuse to even address the issue. ( See rule 8.204(a)(1)(B); *Okasaki v. City of Elk Grove* (2012) 203 Cal.App.4th 1043, 1045, fn. 1; *Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 165.) However, we have no trouble concluding that the evidence here overwhelmingly supports the juvenile court's determination.[9]

It is true that there was some evidence in the record that father was visiting S.M. and C.B. regularly. (See rule 5.710(c)(1)(D)(i)(a).) However, he did absolutely nothing to address the issues which led to the minors' removal for the first nine months after their detention. And, although he finally began engaging in some of his reunification services in May 2015—at the very end of the reunification period—he was not even at the point where assessments had been done to determine the scope of his issues or the trajectory of his necessary treatment. Further, he was still failing to drug test. Under such circumstances, it would be impossible to conclude that father had made "significant progress in resolving the problems that led to the removal of the [minors]." (See rule 5.710(c)(1)(D)(i)(b).) Moreover, the juvenile court could hardly make any kind of reasoned determination regarding father's "capacity and ability to complete the objectives of his treatment plan" within a particular time frame when the specifics of that plan had yet to be developed and father's engagement in, and response to, treatment could not yet

---

[9] In reaching this conclusion, we disregard father's wildly speculative claim that the Agency must have expected that he would be able to resume caring for the minors because it proposed providing " 'supportive' services" to him after the termination of his reunification services. Even if true, there is no evidence that this supposed reunification could or would occur within statutory time frames. Moreover, the much more plausible inference to be drawn from this fact is that the Agency believed supportive services would be in the minors' best interests, not because father might ultimately reunify, but because he would likely remain a part of their lives given their anticipated permanent placement with the paternal grandmother.

be measured. (See rule 5.710(c)(1)(D)(i)(c).) Under such circumstances, the court's conclusion that reunification within the statutory time frame was not "sufficiently probable" for these minors was manifestly appropriate.

**B.** ***Continuation of Services for Sibling Group***

Pursuant to subdivision (e) of section 366.21, the juvenile court, at a six-month review involving a "sibling group," has the discretion to continue reunification services for some or all of the minors. When making this determination, the court—"[f]or the purpose of placing and maintaining a sibling group together in a permanent home"—is directed to consider factors, including but not limited to "whether the sibling group was removed from parental care as a group, the closeness and strength of the sibling bond, the ages of the siblings, the appropriateness of maintaining the sibling group together, the detriment to the child if sibling ties are not maintained, the likelihood of finding a permanent home for the sibling group, whether the sibling group is currently placed together in a preadoptive home or has a concurrent plan goal of legal permanency in the same home, the wishes of each child whose age and physical and emotional condition permits a meaningful response, and the best interests of each child in the sibling group." (366.21, subd. (e); see rule 5.710(d).)[10]

Within this analytical structure, father argues that— given his recent attempts at compliance with his reunification plan and the extraordinary circumstance of his young son's death which impacted his ability to move forward with his services during the reunification period—the juvenile court should have exercised its discretion to extend reunification services for the "sibling group" pursuant to subdivision (e) of section

---

[10] Given the guided discretion already available to the juvenile court within this existing statutory structure, father's argument that the juvenile court "has discretion upon a showing of good cause to continue juvenile dependency hearings beyond the statutory time limits" under *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, is patently irrelevant. *Elizabeth R.* involved the extension of reunification services beyond the 18-month maximum permitted under the Juvenile Court Law for a special needs parent who had largely complied with her reunification plan. (*Id*. at pp. 1777, 1779-1783, 1787, 1797-1799.) It is inapposite here, where the possible continuation of services is already clearly contemplated by statute.

366.21. Our review of such a discretionary decision, however, is limited. Specifically, "[w]e will not disturb the order unless the trial court made an arbitrary, capricious, or patently absurd determination." (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.) Under this standard and on these facts, we cannot find an abuse of discretion.

First, with respect to the specific factors referenced above, S.M. and C.B. lived together for their whole lives and were removed from their parents at the same time. Further, both girls are quite young and close together in age. By father's own admission, they are "inseparable." In addition, S.M. and C.B. are placed together in a concurrent home, the home of their paternal grandmother. By all reports, both minors have been doing well while placed together out of their parents' custody. Moreover, the placement is one which allows S.M. and C.B. to maintain contact with their siblings and other family members with whom they have a "strong attachment." Thus, the record clearly supports the juvenile court's decision to treat the girls as a unit for purposes of determining permanency.

Whether reunification efforts should have been continued for both girls, however, is another question. In truth, father's claim that the juvenile court should have exercised its discretion to continue his reunification services because the death of O.B. negatively impacted his ability to engage in those services has some intuitive appeal. It is easy to speculate that the death of a child might seriously impair a parent's ability to perform even the most mundane tasks of daily living, let alone actively participate in reunification efforts. Under the specific facts of this case, however, we must reject father's contention because there is simply no evidence in the record that O.B.'s illness or death impeded his ability to engage in reunification services in any way. Father did not testify or provide any other evidence as to the impact of O.B.'s situation on him. Further, father was unemployed and, once C.B. and S.M. were detained in August 2014, none of his children were in his care. Instead, his contact with them, including O.B., was limited and in a supervised setting. Thus, any perception that he was overwhelmed with caring for multiple children, including a seriously ill infant, in the months before O.B.'s death is not borne out by the facts. In addition, the record discloses no change in father's

14

behaviors in the wake of O.B.'s birth and diagnosis. Rather, he was arrested twice—in February and November 2014—on trespassing and drug-related charges. He engaged in an incident of domestic violence with O.B.'s mother in July 2014. Thereafter, he abandoned the minors, leading to the August 2014 detention of C.B. and S.M. And, most troubling of all, he was unable or unwilling to conform his behavior to a level which would allow him access to his seriously ill son. In sum, as tragic as O.B.'s death was, there is no indication that it was the reason behind father's decision to essentially ignore his reunification plan for the bulk of the reunification period.

In addition, father makes no showing that continuation of his reunification services would be in the best interests of either S.M. or C.B. (See § 366.21, subd. (e) [in making determination whether to extend services, the court must consider "the best interests of each child in the sibling group"].) As discussed above, father's commitment to reunification was so new that it was impossible to assess the scope of his issues or a realistic time frame for their possible resolution. If anything, though, especially with regards to domestic violence and anger management, the record suggests what appear to be long-term, intractable problems. Nevertheless, father asserts that an extension of his services would not have prejudiced the minors because they were already placed with the paternal grandmother in what was contemplated to be their permanent home. The possibility of future permanence, however, is—by definition—impermanent. The courts "have long recognized that providing children expeditious resolutions is a core concern of the entire dependency scheme. [Citations.] If this is true of dependency cases in general, it is doubly true for the very young." (*Tonya M.*, *supra*, 42 Cal.4th at p. 847, fn. 4.) Here, the record clearly supports the conclusion that the minors' best interests lie in pursuing permanence, despite father's nascent attempts at reunification.[11]

---

[11] Although the juvenile court did not make express best interests findings in this case as required by section 366.21, subdivision (e), reversal is not required where, as here, the correct findings were amply supported by the evidence. (*In re A.J.* (2013) 214 Cal.App.4th 525, 538; *In re Janee W.* (2006) 140 Cal.App.4th 1444, 1450; see *People v. Geier* (2007) 41 Cal.4th 555, 582 [appellate court reviews the correctness of the court's ruling, not its reasoning, "and, if the ruling was correct on any ground, we affirm"].)

Under all of these circumstances, the juvenile court's decision to treat C.B. and S.M. as a unit and expedite their permanency can hardly be deemed arbitrary or absurd. We see no abuse of discretion.

## III.  DISPOSITION

The petition is denied on the merits.  (See § 366.26, subd. (l)(1)(C) & (4)(B).) Because the permanency planning hearing in these matters is set for October 14, 2015, this opinion is final as to this court immediately.  (Rules 8.452(i), 8.490(b)(2)(A).)


_____
REARDON, J.


We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.