Filed 2/17/21  In re N.J. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re N.J. et al., Persons Coming Under the Juvenile Court Law. | B305116 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.M. et al.,<br><br>Defendants and Appellants. | (Los Angeles County Super. Ct. Nos. 19CCJP06645A 19CCJP06645B 19CCJP06645C) |

APPEALS from orders of the Superior Court of Los Angeles County, Stephen C. Marpet, Judge Pro Tempore.  Affirmed in part, reversed and remanded in part.

Lelah S. Fisher, under appointment by the Court of Appeal, for Defendant and Appellant J.M.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant D.Z.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Melania Vartanian, Deputy County Counsel, for Plaintiff and Respondent.

_____

J.M. (mother) appeals from the order of the juvenile court terminating its jurisdiction over her son N.J. after placing the child with his father, T.J., under Welfare and Institutions Code[1] section 361.2, subdivision (b)(1).  We reject most of mother's contentions but agree that the court erred in failing to establish the rate and length of her visits with N.J. in the exit order.

In a separate appeal, D.Z. (father) challenges the order taking jurisdiction over his and mother's son and daughter based on father's substance abuse.  (§ 300, subd. (b)(1).)  We decline to address the contention as father has not challenged the other basis for jurisdiction namely, the parents' domestic violence.

Accordingly, we reverse the exit order and remand it with directions to the juvenile court to specify the frequency and duration of mother's visits with N.J.  In all other respects, the orders are affirmed.

_____

[1]All further statutory references are to the Welfare and Institutions Code.

# BACKGROUND

I. The events leading to the dependencies

A. *The domestic violence incidents*

At issue in this appeal are mother and father's son (age 3) and daughter (age 2), and N.J. (age 6), who is mother's son with T.J. As a nonoffending parent, T.J. is not a party to this appeal.

In late August 2019, mother and father argued about whether mother was cheating on father. In front of the children, father threw a bucket of water at mother and punched her in the face. Mother called law enforcement who arrested father for spousal assault.

Ten days later in early September 2019, law enforcement arrested father a second time and notified DCFS.

Mother had also made two calls to 911 in January 2018 because of father's violence.

DCFS filed a petition under section 300, subdivisions (a) and (b) naming mother and father.

B. *Mother*

Mother refused an emergency protective order after the first incident and indicated she would obtain a restraining order later in the week, but never did. Mother initially indicated that she would go to a shelter. She then decided to move in with maternal grandmother. Instead, mother returned home where the second violent incident occurred. She claimed she was never looking for a shelter; she was looking for housing assistance from DCFS because she and father needed a larger house. After the second violent incident, mother acknowledged she needed a protective order. However, she never followed up in court and then left the children alone with father, once while she studied

for a test, and again the day before he was arrested, to take the test.

C.    *Father*

DCFS found father's interviews to be "extremely difficult" because his responses were "hard to process and comprehend." He jumped from topic to topic, and changed his answers multiple times. The social worker had difficulty following father, whose thoughts were scattered and who at times was seen "zoning out and not focusing on the interview." To produce a timeline of events, the social worker had to piece father's statements together.

In his interview for the detention report, father denied past or current mental health problems or that he was ever prescribed psychotropic medication. Later he acknowledged having been diagnosed with depression in childhood. Father denied substance abuse. Then, he said he occasionally smoked marijuana with his cousins, but did not keep drugs in the house or smoke when the children were present. DCFS found no evidence of drug paraphernalia in father's house. Father agreed to an on-demand test, but warned that the result would be positive for marijuana as he had smoked three weeks earlier. The result of his test, taken 19 days after his second arrest, was positive.

Father was convicted in 2012 of driving under the influence of alcohol (DUI). He denied having been arrested for DUI. DCFS explained that father had "[a]rrests and/or convictions from 2010-2019 use/under influence controlled substance, DUI alcohol drugs (multiple), drive while license suspended/etc. (multiple)." After this interview, father did not respond to numerous attempts by DCFS to interview him again.

4

D.    *T.J.*

Mother told the social worker that she and T.J. have a custody order allowing T.J. to visit N.J., but that he had not seen the child in four years.  Mother claimed she did not know where to find T.J.

Shortly after mother's detention interview, T.J. called DCFS to say that mother contacted him crying that DCFS was taking her children away and that she needed to sign her rights to N.J. over to T.J. immediately.  T.J. was shocked to learn that mother claimed she did not know where he was.  He denied mother's description of his contact with the child.  N.J. stayed with paternal grandmother every other weekend where T.J. visited him.  Mother had represented to T.J. and paternal grandmother that the custody order banned T.J. from visiting N.J.  However, T.J. recently discovered that the custody order awarded him visits every other weekend and on Tuesday and Thursday evenings.

T.J. wanted full custody of N.J.  N.J. knows T.J., his baby half-brother, and T.J.'s fiancée.  T.J.'s fiancée also has three daughters from a previous relationship.  T.J. was employed full time, and paternal grandmother was willing to assist with childcare.

II.    Detention

At the detention hearing in October 2019, the juvenile court ordered N.J. detained from mother and released to presumed-father T.J.  The court detained son and daughter from their parents and placed them under the supervision of DCFS.  Mother enrolled in services.

The jurisdiction report related that a month after moving in with T.J.'s family, kindergartener N.J. appeared to be bonded with T.J., respectful, and polite. Although he had given only terse responses to the social worker's questions when he was in mother's custody, N.J. reported that he liked living with T.J. who is "fun." N.J. was also "very playful" with T.J.'s other children. The child was doing well and reported liking his new school where he was making friends and listening to his teacher. T.J.'s house was clean, organized, and devoid of hazards.

In preparing the jurisdiction report, DCFS learned more from mother about the domestic violence. Mother described father as jealous and insecure. One incident started when father questioned daughter's paternity. Mother explained that father had recently become aggressive with her because father is "like that and that he often gets jealous for reasons that do not always make sense." Once, father accused her of cheating on him with the driver of a passing car who had looked at mother. Mother believed father had stopped using marijuana a year or two earlier. But, a friend of hers who knew about drug use told mother that father must be on drugs if he is "cool one minute and the next he's not."

Visitation went well. T.J. and the maternal relatives began to have good communication. By February 2020, mother was participating in her case plan.

Father finally met with DCFS in late December 2019. He stated he had not smoked marijuana in five weeks. Asked whether he would submit to a drug test, father asked to speak to his attorney because he wanted to use marijuana for his problems. He first claimed to have a medical recommendation for marijuana because of insomnia, migraines, and depression. He

later reversed himself, and admitted he did not have a recommendation as it had expired "a long time ago." Also, despite his initial statement that he had no mental health issues, father admitted he was diagnosed with depression as a child and was previously prescribed Zoloft. No longer using prescription medication, father stated that he was using marijuana to treat his depression. Father provided no proof of participation in any services.

DCFS recommended that the juvenile court terminate the case involving N.J. with exit orders granting T.J. sole physical custody and joint legal custody with mother, who would have monitored contact with the child. As for the other two children, DCFS recommended reunification services for mother and father, and that the court order both children to undergo mental health assessments.

III.    Jurisdiction/disposition

At the hearing in February 2020, the juvenile court sustained the petition as amended, alleging that mother and father have a history of engaging in violent altercations (§ 300, subds. (a) & (b)(1)) and that in September 2019, father entered a plea of nolo contendere to Penal Code section 243, subdivision (e)(1).

Also, the juvenile court sustained the petition's allegation that father "has a history of substance abuse and is a current abuser of marijuana, which renders [him] incapable of providing regular care of the children. On 09/25/2019, . . . father had a positive toxicology screen for marijuana. The children . . . are of such a young age as to require constant care and supervision and . . . father's substance abuse interferes with providing regular care and supervision of the children. The . . . father has a

7

criminal history of a conviction of DUI Alcohol .08 Percent." The petition further alleged that mother knew of father's substance abuse and failed to protect the children and allowed father to have unlimited access to the children. Father's substance abuse and failure to protect endangered the children's physical health and safety. (§ 300, subd. (b).)

The juvenile court ordered that N.J. be placed with T.J. and "pursuant to 361.2, subsection (b), I'm terminating jurisdiction with a family law order of joint legal, sole physical and primary to father. [¶] Mother to have reasonable monitored visits by a monitor approved of by father." The court ordered mother to undergo reunification services.

The juvenile court ordered son and daughter removed from their parents' custody and awarded the parents monitored visitation. Among the reunification services, the court ordered father to undergo a drug and alcohol program with weekly random, on demand testing, and to enroll in a 12-step program.

Five days after the adjudication and disposition hearing, the juvenile court received the custody order, which provided that mother would have visitation until further order of the court. With the exit order in hand, the juvenile court terminated its jurisdiction over N.J. Mother and father each appealed.

## DISCUSSION

I.    Mother's appeal

A.    *No error in terminating jurisdiction over N.J.*

Mother contends that the juvenile court could not immediately terminate jurisdiction over N.J. and instead should have continued his case for at least three months. We disagree.

8

Section 361.2, subdivision (a) governs the placement of a child who is removed from the custody of one parent and placed with the other previously noncustodial parent.  In such a case the juvenile court has three choices; it may terminate its jurisdiction over the child (§ 361.2, subd. (b)(1)), maintain jurisdiction for three months pending a home visit (§ 361.2, subd. (b)(2)), or maintain jurisdiction with court supervision (§ 361.2, subd. (b)(3)).  We generally review the juvenile court's order terminating jurisdiction for abuse of discretion while reviewing its factual findings for substantial evidence.  (*In re A.J.* (2013) 214 Cal.App.4th 525, 535, fn. 7; *In re Janee W.* (2006) 140 Cal.App.4th 1444, 1452.)

When assessing whether continued juvenile court supervision is necessary, courts focus on the dependent children and determine whether in the custody of the nonoffending parent they are still at risk of harm and remain in need of juvenile court protection.  For example, in *In re Janee W., supra*, 140 Cal.App.4th at page 1452, the appellate court affirmed the termination of jurisdiction citing the agency's reports that unambiguously praised how well the children were doing, and how safe, clean, and happy they were.  The appellate court in *In re Sarah M.* (1991) 233 Cal.App.3d 1486, 1499 to 1500, observed that the child was no longer at risk at the final hearing and no longer needed the court's protection.  (See *In re A.J., supra*, 214 Cal.App.4th at p. 535 [evidence supported termination order because there was no " 'protective issue' "].)

The evidence here shows that continued juvenile court jurisdiction was not necessary to protect N.J.  He had been residing with T.J. for four months by the time of the challenged order.  The child liked living with T.J., was playful with his half-

9

siblings, and liked his new school and friends.  The child described a positive relationship with T.J.'s fiancée and was "very bonded" to father.  T.J.'s house was clean, adequate, and hazard free, and T.J. had several family members to help him.  Unlike *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1134, cited by mother, where the agency was unable to ensure that the child was adequately protected in the care of the previously noncustodial parent, DCFS here expressed no concerns about N.J.'s safety in T.J.'s care and repeatedly recommended that the court terminate its jurisdiction over him.

Mother argues that the juvenile court should have chosen the second option under section 361.2, subdivision (b), namely, to keep the case open for three months and order a home visit before deciding to terminate jurisdiction.  She reasons that termination of jurisdiction at the disposition hearing should not be the norm (see *In re Destiny D.* (2017) 15 Cal.App.5th 197, 211); that conflict between her and T.J. *could affect* N.J.'s emotional well-being, especially *if* he became estranged from maternal family; and that T.J. prevented her from visiting as frequently as he had agreed to.  Mother adds that her progress in services showed she could soon be a viable option for custody of N.J.

Addressing these arguments seriatim, first, section 361.2, subdivision (b)(1) gives the juvenile court authority to terminate its jurisdiction at the time it places the child with the previously noncustodial parent, irrespective of whether such action should be the norm.  And here, the court had a four-month record on which to make its assessment about whether continued supervision was necessary.  Second, mother's speculation about the effect on N.J. of any conflict between mother and T.J. does not undermine the record, which shows that court supervision is

10

unnecessary to protect N.J. in T.J.'s care.  Third, contrary to mother's assertion, DCFS reported that visits with N.J. were going well and T.J. had agreed to overnight visits with the maternal grandparents.  As the evidence supports the order, we conclude that the court did not abuse its discretion in terminating its jurisdiction over N.J.  If mother believes there is a change in circumstances based on her progress in services, she may seek modification or termination of the custody and visitation order in the family court.  (§ 362.4.)

Finally, mother argues that reversal is required because the juvenile court failed to make findings on the record for its decision to terminate dependency jurisdiction over N.J. in violation of section 361.2, subdivision (c), which requires a written or oral statement of the basis for the placement and termination rulings.

Admittedly, the record is silent about the juvenile court's reasons for its decision to terminate jurisdiction over N.J. However, regardless of whether we may infer the findings to support such order (see *In re J.S.* (2011) 196 Cal.App.4th 1069, 1078 [doctrine implied findings has limited scope where § 361.2, subd. (c) requires express finding]), we conclude that the court's failure to put the reasons on the record was harmless.  "Before any judgment can be reversed for ordinary error, it must appear that the error complained of 'has resulted in a miscarriage of justice.'  (Cal. Const., art. VI, § 13.)  Reversal is justified 'only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' "  (*In re Cristian I.* (2014) 224 Cal.App.4th 1088, 1098–1099.)

Here there is no reasonable probability that had the trial court actually stated its reasons on the record, it would have declined to terminate its jurisdiction over N.J. The evidence mother cites to support retention of jurisdiction was that T.J. had only sporadic contact with N.J. for most of the child's life *before* being placed in T.J.'s custody, and that T.J. smoked marijuana weeks before N.J. came to live with him. But, apart from the fact that according to T.J. the two had more contact than mother knew about, the overwhelming evidence is that once in T.J's care, N.J. did not require continuing juvenile court supervision. Without a doubt, the court's failure to recite its reasons on the record was harmless.

> B. *The visitation portion of the exit order is error*

Mother contends that the juvenile court's exit order erroneously omitted to specify her visits' minimum frequency and duration, effectively giving father veto power over her visits.

The juvenile court has the power to decide whether any visitation occurs, but its discretion in fashioning visitation as part of its exit order is not unlimited. (*In re S.H.* (2003) 111 Cal.App.4th 310, 317.) The court may not delegate to nonjudicial officials or private parties, or even to the parents, its power to determine the right to and extent of visitation. (*In re Armando L.* (2016) 1 Cal.App.5th 606, 616.) Although the court may delegate responsibility for managing the details of visits, including their time, place and manner (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1374), it must specify their frequency and duration (*In re Grace C.* (2010) 190 Cal.App.4th 1470, 1478).

Here, the exit order clearly awarded mother monitored visitation and gave father the authority only to approve the monitor. However, the exit order left blank the part designating

12

the frequency and length of mother's visits. The portion of the order concerning the visits' rate and duration is unlawful and hence an abuse of discretion. (See *Kim v. Euromotors West/The Auto Gallery* (2007) 149 Cal.App.4th 170, 176–177.) The exit order must be remanded so that the juvenile court can exercise its discretion and establish the frequency and length of mother's monitored visits. As this family's circumstances may have changed since the February 2020 disposition hearing, the court should consider any relevant evidence proffered by the parties concerning the terms of the visitation order. (See *In re T.H.* (2010) 190 Cal.App.4th 1119, 1124.)

## II.    Father's appeal

Father does not appeal from the juvenile court's finding it has jurisdiction over son and daughter based on the parents' domestic violence. Father's sole contention is that there is no evidence that he is a substance abuser and no evidence that his marijuana use presents any risk of harm to the children.

When a juvenile court sustains a petition on multiple grounds, the appellate court can affirm the order taking jurisdiction over the children "if any one of the statutory bases for jurisdiction . . . enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.) Father nonetheless urges us to exercise our discretion to reach the merits because the challenged finding served as a basis for the dispositional order, just as a different panel of this court held in *In re Drake M.* (2012) 211 Cal.App.4th 754, 762 to 763. We decline to address the issue.

13

The juvenile "court is not limited to the content of the sustained petition when it considers what dispositional orders would be in the best interests of the children. [Citations.] Instead, the court may consider the evidence as a whole." (*In re D.M.* (2015) 242 Cal.App.4th 634, 647 (dis. opn. of Chavez, J.).) When "the court is aware of other deficiencies that impede the parent's ability to reunify with his child, the court may address them in the reunification plan." (*In re Christopher H*. (1996) 50 Cal.App.4th 1001, 1008.) The record establishes that father admitted he was self-medicating with marijuana and even asked to speak to his attorney so that he could continue using that drug. Father tested positive for cannabinoids and declined to test a second time. He had multiple arrests for driving under the influence of drugs or alcohol. During his interviews with DCFS, father appeared to be "zoning out and not focusing on the interview." Regardless of whether the evidence supported the finding he was a substance abuser, on this record the court had the authority to order father to undergo the drug-related services that were fashioned for the benefit of both the children and father (see *In re D.M.*, at p. 647 (dis. opn. of Chavez, J.)), with the result it is unlikely that were we to address father's sole contention on appeal, the disposition order would change.

14

## DISPOSITION

The portion of the exit order concerning visitation is reversed, and the matter is remanded to the juvenile court with directions to specify the frequency and duration of mother's visits. In all other respects, the orders are affirmed.

NOT TO BE PUBLISHED.


DHANIDINA, J.


We concur:


LAVIN, Acting P. J.


EGERTON, J.