Filed 6/30/23  In re A.M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.M., A Person Coming Under the Juvenile Court Law. | |
| | D081332 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J521039) |
| v. | |
| H.B., | |
| Defendant and Appellant; | |
| M.M., | |
| Intervener and Respondent. | |

APPEAL from orders of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Natasha C. Edwards, Deputy County Counsel, for Plaintiff and Respondent.

Diana W. Prince, under appointment by the Court of Appeal, for Intervener and Respondent.

H.B. (Mother) appeals from the juvenile court's orders concerning her son A.M. She contends insufficient evidence supports the juvenile court's assertion of jurisdiction and its removal of A.M. from her custody. She also claims the juvenile court abused its discretion by granting A.M.'s father, M.M. (Father), sole physical custody and terminating jurisdiction. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Mother is a board certified physician in pediatrics and pediatric emergency medicine. In 2015, she married Father and the couple lived in Hawaii. Mother gave birth to A.M. in late 2017. When A.M. was two and one-half years old, Mother went to the police because, among other things, she claimed she saw Father in the bathtub with A.M. and he let A.M. touch his private area. The State of Hawaii Department of Human Services (DHS Hawaii) received several referrals relating to alleged sexual abuse, physical abuse, or verbal abuse of A.M. by the parents. Mother obtained a one year restraining order in Hawaii against Father based on her allegations of sexual abuse. Mother filed for a divorce in April 2020 and the parents finalized their divorce in July 2021. Under the terms of the dissolution and custody order, the parents shared joint legal custody, Mother received physical custody of A.M., and Father received supervised visitation with A.M. three times per week.

Mother moved to San Diego in November 2021 where she worked at a children's hospital until May 2022[1] when she reported to police that she and A.M. were being followed by a couple while at the beach. After that incident,

_____

[1] Undesignated dated references are to 2022.

2

she started working in telehealth seeing pediatric patients online. Five days after this first incident, Mother reported to police that a man came up behind her in a checkout line with a knife in his hand. Mother purchased a Kevlar vest to protect herself because she was "very, very scared" another person may approach her with a knife. That night, according to Mother, she noticed missing documents on her computer related to Father, including audio and video recordings of A.M.'s disclosures. Mother fled to Arizona for a week. She returned to San Diego because she believed she had been followed to Arizona. When she returned to California she found a "gallon's worth" of white powder under the driver's seat of her car, went to the hospital and asked to be tested for anthrax poisoning. Although Mother had a home, she started residing at hotels in May and purchased new vehicles and new phones to hide from people she believed Father had sent to kill her.

Between February to June, the San Diego County Health and Human Services Agency (Agency) received ten referrals, consisting of six for alleged sexual abuse and two for alleged physical abuse. All ten referrals did not meet the criteria for investigation. On June 2, Mother arrived at A.M.'s school wearing a bulletproof vest. She had a loaded gun in the center console of her car that the police confiscated. On June 9, Mother appeared at A.M.'s school wearing a bulletproof vest and carrying a knife and pepper spray. Mother told law enforcement she was being followed and Father wanted to kill her to gain custody of A.M. Her demeanor "fluctuated between calm and agitated" and she did not recognize the danger of bringing weapons to school.

Mother was placed on a section 5150 hold as a danger to others, and A.M. went to Polinsky Children's Center. During this hold, the Agency learned that law enforcement had received 14 calls from several different individuals over the past two to three weeks reporting Mother's erratic

behavior.  On June 14, the Agency filed a petition alleging A.M. fell within section 300, subdivision (b) due to Mother's mental health issues.  Mother appealed the section 5150 hold and was released on June 15.  At discharge, the hospital recommended psychiatric and medical intervention and follow up.

At the detention hearing on June 15, the juvenile court found there was prima facie showing A.M. was described by section 300, ordered him detained, and ordered supervised visitation for the parents.  At this time, A.M. resided with caregivers in a confidential resource home.[2]  On June 23, A.M. underwent a forensic interview where he said that Father " 'put his penis in [my] butt' " and tried to pee in his hair, but denied Father did anything else to hurt him and provided little detail about the first incident.  A.M. expressed fear of Father and believed Father had tried to hurt Mother with knives.  He also reported fearing Mother when she yells at him.

At the July 6 jurisdiction and disposition hearing, the court found it had jurisdiction, noted a Hawaiian restraining order against Father was set to expire on September 6, invalidated a temporary restraining order Mother had obtained in family court, and set the matter for a contested hearing.  In August, the parents completed their respective parenting classes.  In September, Mother was diagnosed with "other psychotic disorder not due to a substance or physiological condition."  She was prescribed medication and referred to North Central Mental Health Center.  At the pre-trial status conference on September 7, the Agency informed the juvenile court that

---

[2]     Mother also accused A.M.'s caretakers of sexual abuse.  Mother told one of her friends in late June that A.M.'s caretakers were abusing him by putting A.M.'s penis in water to make it " 'nice and soft.' "  The friend stated Mother's allegations against the caregivers were "very similar" to the allegations Mother made against Father.

based on the expiration of the Hawaiian restraining order, it was moving Father to unsupervised visitation. In late September, the Agency placed A.M. with Father. The social worker attempted to get updates about Mother's progress in services from North Central Mental Health Center but was unable to do so because Mother had only signed a limited release of information. In November, Mother discharged herself from services and was allegedly seeing a nurse practitioner.

The contested adjudication and disposition hearing took place in early December. After receiving the Agency's reports into evidence, the court heard testimony from Mother's expert Dr. Abraham Lobenstein, who had performed a psychological evaluation on her. The court also heard testimony from the social worker, and Mother.

The juvenile court found the allegations in the petition true by a preponderance of evidence, stating that the evidence was "pretty clear" A.M. has been entangled in Mother's delusions and was at risk physically and emotionally from his exposure to these delusions. It noted Mother had failed to follow Dr. Lobenstein's recommendations that she continue her medications, remain in therapy, and rely upon third-party observers to determine if A.M. was abused. It did not find Dr. Lobenstein's testimony that Mother showed signs of improvement as sufficient to ameliorate the current risk to A.M. The court found Mother to be "an intelligent person who knows what to say at the right time" but "I don't have a person who I think is without risk."

The court found by clear and convincing evidence A.M. should continue to be removed from Mother. It added that even if Mother's delusions were true, A.M. should not be exposed to those fears and Mother had not shown enough improvement to ameliorate the risk of harm to A.M.'s physical and

emotional health.  It noted that under Welfare and Institutions Code[3] section 361.2, it was required to place A.M. with Father unless it found such placement would be detrimental to A.M.  It found no detriment because Mother's allegations against Father have not been substantiated, "[a]ll we have really are the words, and the words have been repeated by the child because they've been put in the child's mouth."  Because the court had no concerns regarding Father, it exercised its discretion to terminate jurisdiction, ordering that Father have legal and physical custody of A.M., with supervised visitation for Mother.

DISCUSSION

I.

*Substantial Evidence Supports the Juvenile Court's Jurisdictional and Dispositional Findings*

A.  *General Legal Principles*

A parent may seek review of both the jurisdictional and dispositional findings on an appeal from the dispositional order.  (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.)  We review the juvenile court's jurisdictional and dispositional orders for substantial evidence.  (*In re I.J.* (2013) 56 Cal.4th 766, 773.)  The burden of proof for jurisdictional findings is preponderance of the evidence; for removal, it is clear and convincing evidence.  (*Cynthia D.*, at p. 248.)  In applying the substantial evidence standard of review, " ' "we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."

_____

[3]    Undesignated statutory references are to the Welfare and Institutions Code.

[Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*In re I.J.*, at p. 773.)

B. *Substantial Evidence Supports the Jurisdictional Findings*

To establish jurisdiction under section 300, subdivision (b)(1), the Agency must show: "(1) [a] parent's . . . neglectful conduct or failure or inability to protect the child; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re Cole L.* (2021) 70 Cal.App.5th 591, 601.) A court "need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child." (*Id.* at p. 602.) A parent's " ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*Ibid.*) However, " '[t]o establish a defined risk of harm at the time of the hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur." ' " (*Ibid.*) " 'Facts supporting allegations that a child is one described by section 300 are cumulative.' [Citation.] Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.' " (*In re. T.V.* (2013) 217 Cal.App.4th 126, 133.)

The petition alleged a substantial risk existed that A.M. will suffer serious physical harm or illness based on Mother's delusions. (§ 300, subd. (b)(1).) Mother claims that insufficient evidence supports the jurisdictional finding because the court based its decision on stale events that occurred in June and not on any current evidence of risk of harm. She asserts that insufficient investigation was done regarding her allegations about Father and, if she had no history of delusions, her continued concerns about possible sexual abuse of A.M. by Father would be a sign of good parenting.

7

As a preliminary matter, the record does not support Mother's claim that her allegations of sexual abuse by Father were inadequately investigated. The Agency obtained the family's child welfare services history from Hawaii which revealed all allegations against Father were unconfirmed, no physical evidence of harm to A.M. was found, and Hawaii closed its investigation. Rather, there were several reports that Mother was coaching A.M. A Kauai police officer reported Mother appeared to be coaching A.M. "on things to say, and how to say them." The videos Mother submitted to Hawaiian law enforcement were "indicative of coaching of the child to perform gestures." Additionally, DHS Hawaii noted that the alleged sex abuse lacked "context" and it "appears at times [Mother] coaches [A.M.] to disclose sex abuse. There is concern for the content that [A.M.] shares with little to no detail." The social worker echoed this concern. Referring to her expertise in dealing with sexual abuse cases, the social worker remarked that A.M. has not shown any behaviors suggesting sexual abuse such as bedwetting or night terrors, nor have any sexually inappropriate behaviors been observed by third parties.

The social worker considered Mother's allegations against Father to be serious and stated the Agency "investigated throughout the life of this case." Additionally, Mother testified that A.M. had undergone three forensic interviews and an emergency room evaluation. Despite this investigation, the Agency did not believe Mother's allegations of sexual abuse by Father. The juvenile court agreed with the Agency. It found Mother's claims that Father sexually abused A.M. had "been evaluated over and over again" but the claims had not been substantiated in any of the forensic interviews or any of the investigations and A.M. has "stated the same things that have been stated to him." On this record, the juvenile court concluded Mother's

allegations against Father were unsubstantiated. Our job is not to reweigh the evidence or reevaluate witness credibility (*In re I.J.*, *supra*, 56 Cal.4th at p. 773), and we reject Mother's suggestion that her continued allegations against Father demonstrated good parenting.

We also reject Mother's claim the court improperly based its decision on events that occurred when the dependency petition was filed and not on the current evidence of risk of harm. In October, four months after the Agency filed the petition, Mother continued to allege sexual abuse by Father. Mother claimed that during a supervised visit she asked A.M. whether "his Dad ha[d] done anything," with A.M. responding that Father "wipes him after he poops" and put his finger in his anus. Mother informed A.M. that Father was "not supposed to be doing that." Thereafter, Mother told a social worker that Father had cancelled a visit the past Saturday not due to car trouble but because Father "is now molesting [A.M.] and he doesn't want her to find proof" and complained the court had given custody of A.M. to Father " 'despite her allegations and "proof" that [Father] had molested [A.M.]' " In early November, the social worker received an email from the center supervising Mother's visits stating that "[d]ue to [Mother's] in-directable and inappropriate behavior towards [the] staff" it would no longer monitor visitations for her. Among other things, Mother was not willing to be redirected regarding her hostile behavior or having appropriate conversations in front of A.M.

On December 1, approximately six months after the Agency filed the dependency petition and one week before the contested hearing, Mother made another report to Hawaiian law enforcement regarding alleged sexual abuse of A.M. by Father. That month, Mother also contacted Father's ex-wife and asked her to testify that Father molested A.M. At the contested hearing,

9

Mother claimed Father would be "on his best behavior until today's court date" but that placing A.M. with Father would be detrimental to A.M. because "there still is a grave risk for that abuse to occur."

Mother also continued to believe someone had hacked her computer to delete evidence of Father's sexual abuse of A.M., and inconsistently claimed Father had planted photos on her phone and I-Cloud showing he had sexually abused A.M. She also continued to believe people had followed her on the beach and the man in the checkout line "was there for [her] because he was like glaring at [her], smiling at [her], holding the knife, waiting for [her] to see it." She claimed this incident was related to the photos disappearing on her phone and attributed this to Father. When asked whether she still believed people had been following her in Arizona, Mother replied:

> "I don't know. I saw two camcorders in Phoenix. And they appeared to be moving the camera as I drove by. But they could have been filming for the morning news and showing the traffic jams and everything like that. I don't know if they were following me or not, but I was so scared when I left here that I was scared I was going to be followed. So I was looking around for people that could have been following me. So I don't know if it was real or not."

Based on this evidence, the juvenile court could reasonably believe Mother still experienced the same delusions which previously caused her to flee to another state, wear a bulletproof vest, and pickup A.M. from school carrying a knife and pepper spray. The record supports the juvenile court's finding that A.W. remained at risk of both emotional and physical harm and in need of juvenile court intervention.

C. *Substantial Evidence Supports the Removal Order*

When a minor has been adjudged a dependent child of the court under section 300, the juvenile court may limit the control to be exercised over the dependent child by the parent or guardian. (§ 361, subd. (a).) A dependent

child may not be taken from the physical custody of the parent with whom the child resides unless the juvenile court finds by clear and convincing evidence that there is a "substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected" without removal. (*Id.*, subd. (c)(1).) " 'The court may consider a parent's past conduct as well as present circumstances.' " (*In re John M.* (2012) 212 Cal.App.4th 1117, 1126.) Because the juvenile court must make its finding that a ground for removal exists under the clear and convincing evidence standard of proof (§ 361, subd. (c)), "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true" (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011).

Mother submits she did not pose a substantial risk of harm to A.M. if he was returned to her custody because no evidence existed she continued her prior behavior of expressing her fears to A.M. She complains the court simply reiterated its reasoning from its jurisdictional finding without explaining what current behaviors proved by clear and convincing evidence she posed a substantial risk of harm to A.M. if he were returned to her custody.

The juvenile court's jurisdictional findings are prima facie evidence a child cannot safely remain in the home. (§ 361, subd. (c)(1).) Here, the juvenile court relied on section 361, subdivision (c)(1), finding by clear and convincing evidence that A.M. should continue to be removed from Mother's custody for the same reasons it already stated in making its jurisdictional finding. As we previously noted, a week before the contested hearing, Mother

11

again contacted Hawaiian law enforcement regarding alleged sexual abuse of A.M. by Father. Although the Agency concluded Mother's allegations against Father were unsubstantiated, at the contested hearing Mother continued to believe Father posed a risk to A.M. She also maintained her initial belief that people had followed her on the beach and a man in a checkout line held a knife and was there for her. (*Ante*, pt. I.B.) Accordingly, the social worker opined that Mother's mental health still posed a high risk to A.M.'s well-being.

During the investigation, A.M.'s therapist reported that A.M. "was concerned about [Mother's] level of worry as she talked openly about her worries in front of [A.M.]" At the hearing, the social worker expressed protective concerns regarding A.M.'s emotional well-being from being exposed to Mother's ongoing claims he was being sexually abused. Dr. Lobenstein similarly concluded, assuming A.M. had not been sexually abused, Mother's act of discussing sexual abuse with A.M. would be harmful to him. Dr. Lobenstein also testified that Mother's behavior of taking dramatic steps to protect herself from imagined danger is very stressful to a child and can cause emotional harm to the child. Dr. Lobenstein opined Mother could alleviate protective concerns regarding A.M. by participating in psychotherapy, continuing her medications, and relying on third-party observers to make conclusions regarding possible abuse issues regarding A.M.

At the time of the hearing, however, the Agency did not know what services Mother was currently engaged in and had no progress report or treatment goals from Mother's service providers because Mother had only recently signed a full release. Mother was seeing two mental health providers but allowed the Agency to speak to only one provider who could not

12

opine on Mother's safety regarding A.M. Significantly, there is no evidence Mother attempted to use a third-party observer to validate her abuse concerns before she again contacted Hawaiian law enforcement. Also, a list of Mother's mental health appointments shows the number of appointments she attended decreased each month with her attending only four appointments in November. This record supported the juvenile court's conclusion that if returned to Mother's care, A.M. would be at risk of physical and emotional harm.

Mother next contends the Agency and the court failed to consider reasonable alternatives to removal. She claims no evidence existed showing she would not follow court orders and submits any remaining concerns about her could be addressed through a safety plan and the provision of family maintenance services. She asserts her case is similar to *In re Ashly F.* (2014) 225 Cal.App.4th 803 (*Ashly F.*), in which the juvenile court "did not 'state the facts' supporting its conclusion." (*Id.* at p. 810.) Mother submits the court's removal order amounts to a miscarriage of justice and requests we remedy it by reversing with instructions to follow the mandates of subdivisions (c)(1) and (e) of section 361.

Before the juvenile court may remove a child from a parent's custody there must be clear and convincing evidence of "no reasonable means" of protecting the child other than removal. (§ 361, subd. (c)(1).)[4] When removing a child under section 361, "[t]he court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the

---

[4] As a reasonable means to protect the child, the court must consider removing the offending parent from the home (§ 361, subd. (c)(1)(A)) and allowing a nonoffending parent to retain physical custody if the nonoffending parent presents an acceptable plan demonstrating the ability to protect the child from future harm (*id.*, subd. (c)(1)(B)).

need for removal of the minor from his or her home" and also "shall state the facts on which the decision to remove the minor is based." (*Id.*, subd. (e).) Likewise, the Agency was required to include a discussion of its reasonable efforts to prevent or eliminate removal in its social studies. (Cal. Rules of Court, rule 5.690(a)(1)(B)(i).)

The court concluded "[r]easonable efforts have been made to prevent and eliminate the need for the removal" of A.M. from Mother's home but did not "state the facts" supporting this conclusion. (See *In re L.O.* (2021) 67 Cal.App.5th 227, 247 [factual findings deficient because they failed to address reasonable means of preventing removal from father's custody]; *Ashly F.*, *supra*, 225 Cal.App.4th at p. 810 [court failed to state facts supporting its conclusion that reasonable efforts had been made to eliminate the need for removal].) Additionally, the Agency failed to include a discussion of reasonable efforts in its social studies—it merely concluded reasonable efforts had been made to prevent removal.[5]

This error alone does not warrant reversal. The failure to make the required findings under section 361, subdivision (e) is deemed harmless if " ' "it is not reasonably probable such finding, if made, would have been in favor of continued parental custody." ' " (*In re L.O.*, *supra*, 67 Cal.App.5th at p. 247.) On this record, we find it not reasonably probable the result would have been more favorable to Mother but for this error. At the contested

---

[5]  In its jurisdiction/disposition report, the Agency concluded that A.M. could not be safely returned to Mother. Under the heading "Reasonable Efforts" the Agency noted it held CFT meetings separately with Mother and Father, a CSF referral had been submitted for Mother, an Optum/TERM therapy referral had been submitted for A.M., and a CASS referral was submitted for A.M. We reject the Agency's contention that these notes adequately satisfied its obligation to discuss the reasonable efforts it made to prevent or eliminate removal. (Cal. Rules of Court, rule 5.690(a)(1)(B)(i).)

hearing, the Agency concluded no reasonable means existed to protect A.M. "given the history and the escalating behaviors of [Mother]." On appeal, she suggests the Agency's concerns could be addressed through a safety plan, the provision of family maintenance services, or living with a roommate. However, she fails to explain how these alternatives would have allowed A.M. to safely remain in her custody given the evidence of her continued delusional thinking.

Dr. Lobenstein opined Mother could alleviate protective concerns by relying on third-party observers to make conclusions regarding possible abuse issues regarding A.M. But at the time of the hearing, Mother still relied on her own observations which included talking to A.M. Additionally, Mother's delusions continued despite her participation in services, and Dr. Lobenstein explained he did not expect Mother's delusions "to disappear from the time I saw her in July until now. This is something that takes work and time." Thus, if returned to Mother's custody, A.M. would again be subjected to Mother's delusions, which the Agency and Dr. Lobenstein agreed would be detrimental to him.

On this record, we find it improbable the juvenile court would have made a different decision on the question of A.M.'s removal even if it had made all the factual findings required by section 361, subdivision (e). Therefore, the error was not prejudicial and does not require reversal.

II.

*The Juvenile Court Did Not Err in Terminating Jurisdiction*

Following placement of a child with the noncustodial parent, the juvenile court has the discretion to either terminate its jurisdiction with custody orders, or require a home visit within three months, or continue its supervision with reunification services. (§ 361.2, subds. (b)(1)-(3).) We

15

review the juvenile court's order terminating jurisdiction for abuse of discretion. (*In re A.J.* (2013) 214 Cal.App.4th 525, 535, fn. 7.) We will reverse the juvenile court only if it exceeded the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.) We review the court's factual findings in support of its order terminating jurisdiction for substantial evidence. (*In re A.J.*, at p. 535, fn. 7.)

In this case, the juvenile court selected the first option, granting Father full custody and terminating jurisdiction without ordering reunification services for Mother. Mother submits the court abused its discretion when terminating jurisdiction because it did not consider the benefit of placing A.M. with Father and ordering reunification services for her. We find no abuse of discretion.

The court opted to terminate jurisdiction, one of the three allowable statutory options. It explained the reason for choosing one of the remaining two options was the existence of ongoing concerns regarding Father that merited keeping the case open, but stated it and the Agency had no concerns regarding Father that merited continuing jurisdiction. The evidence here does not support a finding that continuing juvenile court jurisdiction was necessary to protect A.M.[6] Mother also failed to demonstrate the advantage

---

[6]  Father demonstrated to the Agency his ability to care for A.M.'s physical and emotional needs. A.M. had been residing with Father for over two months by the time of the challenged order. During closing argument, A.M.'s guardian ad litem informed the court that A.M. enjoys living with Father. The director of A.M.'s daycare center reported that in the two months A.M. has been with them A.M.'s anxiety has subsided, his prior aggression toward his classmates has changed to a "caring attitude for his classmates" and "[t]he relationship between [Father and A.M.] has grown tremendously from day one until now and we can't wait to see it further blossom."

16

of continuing jurisdiction or explained how a safety plan, reunification services or roommate would protect A.M. from her continued delusions. Because the evidence supports the order, we conclude the court did not abuse its discretion in terminating its jurisdiction over A.M.  If Mother believes there is a change in circumstances, she may seek modification or termination of the custody and visitation order in the family court.  (§ 361.2, subd. (b)(1).)

DISPOSITION

The orders are affirmed.


BUCHANAN, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DATO, J.